Filed 12/22/15  California Clean Energy Committee v. County of Placer CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| CALIFORNIA CLEAN ENERGY COMMITTEE, Plaintiff and Appellant, v. COUNTY OF PLACER, Defendant and Respondent; HOMEWOOD VILLAGE RESORTS, LLC, et al., Real Parties in Interest and Respondents. | C072680 (Super. Ct. No. SCV0030337) |

In this appeal from a judgment denying a petition for a writ of mandate and complaint for injunctive or declaratory relief, appellant, nonprofit corporation California Clean Energy Committee (Clean Energy), challenges the County of Placer's (County) approval of a proposal to expand an existing ski resort on the West Shore of Lake Tahoe. The proposal, the Homewood Mountain Resort Ski Area Master Plan (Project), was submitted by real parties in interest Homewood Village Resorts, LLC, and JMA, LLC (collectively, Homewood).

Clean Energy contends the County's approval of the Project implicates defects in the Placer County General Plan (General Plan) in violation of the Planning and Zoning

1

Laws (Gov. Code, § 65000 et seq.), because the General Plan does not "address evacuation routes" for this high-risk wildfire area, as required by Government Code section 65302.[1]  Clean Energy did not challenge the General Plan when it was adopted in 1994 and 1998, but relies on authority that inadequacy of the General Plan may render a subsequent project approval ultra vires.

Clean Energy also contends the County violated the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) because the environmental impact report (EIR) for the Project failed to consider:  (1) increased wildfire *evacuation* risks; (2) energy impacts for expanded snowmaking; (3) other energy impacts; (4) world travel impacts; and (5) because the evidence is insufficient to support the findings of infeasibility of carbon offsets and rail packages as climate disruption mitigation measures.

We conclude the Project approval is valid under the Planning and Zoning Laws, but invalid under CEQA due to the failure to describe and analyze the wildfire evacuation risk.

We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

Homewood Mountain Resort (Resort), which opened in 1962, encompasses more than 1,200 acres along the West Shore of Lake Tahoe, along State Route (SR) 89, six miles south of Tahoe City.  Access to the Resort is via SR 89, also known as West Lake Boulevard.  Northbound SR 89 connects with Interstate I-80 and SR 28, while

---

[1] This case arose before amendment of the pertinent statutes in 2012 (Stats. 2012, ch. 311, § 2 [Sen. Bill No. 1241]), which among other things added fire hazard considerations to Government Code section 65302 and CEQA.  While we discuss this new legislation in more detail, *post*, the Legislature made these new requirements prospective only.  Therefore, the amendments do not apply to the Project here.  Our references to Government Code sections 65302 relate to that version of the statute in effect before the 2012 amendments, unless otherwise indicated.

southbound SR 89 connects with U.S. Highway 50.  Other communities on the West Shore also depend on SR 89 for emergency evacuation in the event of a wildfire or other disaster.

The Resort currently has 1,396 single-family homes/condominiums and 80 apartments.  Due to lack of overnight accommodations, the Resort is primarily a " 'day ski' " area.

In 2006, JMA bought the Resort, and in 2007, it submitted the plan to expand the Resort.  The plan ultimately approved by the County was not the original submission but rather a revised "Alternative 1A" submitted by Homewood in response to community concerns expressed after circulation of the draft EIR.  The plan is to redevelop the "North Base" for mixed-use, the "South Base" for residences, and the "Mid-Mountain area" for a lodge and beginner ski area.  The plan for the 17-acre North Base area is to build six new mixed-use structures and eight new townhouse structures to provide up to:  56 residential condominiums; 16 townhouses; a resort lodge with 75 hotel rooms, 40 two-bedroom for sale condominium/hotel units, 30 penthouse condominium units, 25,000 square feet of commercial space, 13 employee housing units, a four-level parking structure for 272 vehicles, and 30,000 square feet of skier services.  The plan for the six-acre South Base is for a neighborhood residential area with up to 95 residential units in chalets and a three-story lodge, and 145 parking spaces.  The plan for the Mid-Mountain area is for a 15,000 square foot day-use lodge, a learn-to-ski lift, a food facility, sundry outlet, outdoor swimming pool, and emergency services and storage of firefighting equipment.[2]

---

[2] Despite this significant increase in population within the Project area, Homewood argued in the trial court that the Project would not bring a large number of new residents, workers, and visitors adding to the emergency evacuation risk, because the Project would be required to offset the proposed on-site increase in tourist accommodation units (TAUs) with a reduction in TAUs elsewhere in the Tahoe Basin.  However, the cited page of the administrative record (the Board's Statement of Overriding Considerations for CEQA) discussed the Project's air quality impacts from vehicles traveling to and from the Resort.

In total, the Project would add 325 dwelling units -- 230 in the North Base area and 95 in the South Base area.**3**

A draft EIR for the Project was published on January 21, 2011. Various comments were submitted from Clean Energy and others. As we set forth in more detail, *post*, Clean Energy's comments relevant to this appeal included: (1) the EIR must evaluate environmental impacts of increased long-distance travel to the Tahoe basin resulting from increased tourism; (2) the EIR should evaluate how energy-efficiency measures could conserve energy using an integrated approach that considers both energy efficiency and clean energy resources; (3) the EIR should address the risk of reliance on uncertain energy supplies such as a public utility company that relies on coal generation which produces emissions known to be environmental hazards; (4) climate impacts should be fully mitigated by measures such as carbon credits and marketing for rail packages; (5) the EIR must consider how climate change, which will result in greater use of snowmaking, will increase energy consumption, water consumption and supply, greenhouse gas (GHG) impacts, and wildfire risk; (6) the EIR should determine impacts on evacuation safety in the event of wildfire or other disaster, given the limited evacuation routes (SR 89 northbound and southbound); and (7) the EIR revealed deficiencies in the General Plan, which violated state law by failing adequately to "address evacuation routes" in fire hazard areas.

The final EIR was published on October 3, 2011. We discuss its substance in detail, *post*. In brief, the EIR found that: (1) the Project would have a significant impact on routine traffic in the area, which is already congested, particularly at the Tahoe City

---

It says nothing about getting extra people out of the Project area during an emergency evacuation.

**3** We take these numbers from the County's Resolution certifying the EIR. Other parts of the record appear to use other numbers. However, for purposes of this appeal, the *exact* numbers are immaterial.

4

"Wye" and at the Fanny Bridge connection of SR 89 to SR 28, and particularly in the summer months; (2) future expansion of the bridge was planned but was uncertain due in part to lack of funding; (3) the Project would expose people to a significant risk of injury or death from wildfires; (4) mitigation measures increasing *fire protection* capacity -- including expanded snowmaking -- would reduce the risk to less than significant; (5) the Project would have a significant effect on emergency response or evacuation plans; (6) the fact that major buildings and facilities were concentrated next to SR 89 sufficed to ensure adequate evacuation routes; and (7) mitigation measures for emergency *access* would reduce the risk regarding emergency response *or emergency evacuation plans* to less than significant.

The EIR also said the Project would expand snowmaking from 23.8 acres to 102.3 acres, increasing water demand from 14.2 million gallons per year to 60.8 million gallons per year, which will require additional water supply, distribution pipelines, electrical supply, transmission lines, and equipment. But the EIR deferred environmental analysis of expanded snowmaking to a later time, committing the County to prepare a second tier project EIR.

On October 18, 2011, the County's Planning Commission recommended that the County Board of Supervisors (the Board) certify the final EIR and approve the Project. By separate action, the Planning Commission found the proposed tentative map consistent with the General Plan and approved a conditional use permit, planned development permit, and vesting tentative subdivision map. Other Project opponents filed an administrative appeal from the Planning Commission's action.

After hearings, on December 6, 2011, the Board determined the Project's social and economic "benefits outweigh the Project's significant unmitigated adverse impacts," and "the adverse environmental impacts of the Project that are not fully mitigated are acceptable." The Board accordingly:

1. Denied the appeal;

2.  Adopted a Resolution (Res. No. 2011-327) titled "A RESOLUTION CERTIFYING THE FINAL [EIR], AND ADOPTING CEQA FINDINGS AND A STATEMENT OF OVERRIDING CONSIDERATIONS AND A MITIGATION MONITORING PROGRAM REGARDING THE HOMEWOOD MOUNTAIN RESORT SKI AREA MASTER PLAN PROJECT" (CEQA Resolution) certifying the final EIR and adopting CEQA findings, a statement of overriding considerations, and a mitigation monitoring and reporting program for the Project (Alternative 1A);

3.  Adopted a Resolution (Res. No. 2011-328) amending the West Shore Area General Plan to include the Project within the plan area boundaries as allowable uses;

4.  Adopted an Ordinance (Ord. No. 5659-B) approving a development agreement for the Project, Alternative 1A;

5.  Upheld the Planning Commission's action and approved the Conditional Use Permit and Planned Development Permit; and

6.  Upheld the Planning Commission's action and approved the Vesting Tentative Subdivision Map for the Project.

On December 8, 2011, Clean Energy, alleging it represents the general public who will be affected by the Project, filed its petition for writ of mandate and claim for declaratory and injunctive relief.  The pleading alleged CEQA violations in three counts: (1) inadequate analysis of the Project's impacts (e.g., on transportation, air quality, energy, climate disruption, and emergency evacuation), alternatives, and mitigation measures; (2) adoption of findings unsupported by substantial evidence; and (3) failure to recirculate the EIR after the draft EIR elicited new information.  A fourth count, for declaratory and injunctive relief, alleged the Project approval implicated various defects in the General Plan, including failure to comply with the mandate of Government Code section 65302, subdivision (g)(1), that a general plan "shall . . . address evacuation routes . . . [for] identified fire and geologic hazards."  The pleading asked for a writ of mandate commanding the County to vacate its EIR certification and Project approval, a

6

declaratory judgment that the General Plan is invalid and that the Project cannot proceed without a revised EIR, and injunctions restraining construction and further Project approval until the General Plan's safety element complies with the statute.

The trial court issued a written ruling concluding the General Plan substantially complied with the statutory mandate to "address" evacuation routes; Clean Energy was demanding more than was required by the Planning and Zoning Law and CEQA; the County had broad discretion to determine the appropriate "threshold" for evaluating environmental impacts; and substantial evidence supported the County's findings.

The trial court entered judgment denying the petition.

## DISCUSSION

### I. Planning and Zoning Law - The General Plan Contention

Clean Energy contends the Project approval is invalid because the General Plan fails to "address" emergency evacuation routes in fire hazard areas, as required by statute (Gov. Code, § 65302, subd. (g)(1)[4]), and the County consequently approved the Project without addressing emergency evacuation routes, rendering the Project approval invalid. This contention is based on: (1) the Subdivision Map Act, Government Code section 66473.5,[5] which provides that a subdivision map cannot be approved unless it is

---

[4] Government Code section 65302 states in pertinent part: "The general plan shall consist of a statement of development policies and . . . shall include the following elements: [¶] . . . [¶] (g)(1) A safety element for the protection of the community from any unreasonable risks associated with the effects of . . . wildland and urban fires. . . . It shall also *address evacuation routes*, military installations, peakload water supply requirements, and minimum road widths and clearances around structures, as those items relate to identified fire and geologic hazards." (Italics added.)

[5] Government Code section 66473.5, as part of the Subdivision Map Act, states: "No local agency shall approve a tentative map, or a parcel map for which a tentative map was not required, unless the legislative body finds that the proposed subdivision, together with the provisions for its design and improvement, is consistent with the general plan required by [Gov. Code, § 65300 et seq.]."

7

consistent with the general plan; and (2) case law holding that a project cannot be consistent with an *invalid* general plan. (*Neighborhood Action Group v. County of Calaveras* (1984) 156 Cal.App.3d 1176, 1187-1188 (*Neighborhood Action*); *Guardians of Turlock's Integrity v. Turlock City Council* (1983) 149 Cal.App.3d 584, 598 (*Guardians*) [project approval was not consistent with general plan because general plan was invalid for lack of a noise element]; *Camp v. Board of Supervisors* (1981) 123 Cal.App.3d 334, 348 (*Camp*) [trial court properly enjoined county from project approval until it had adopted a valid general plan].) Such a claim may be brought despite failure to challenge adoption of the general plan within the 90-day statute of limitations, as long as there is a nexus between the project approval and the general plan. (*Avenida San Juan Partnership v. City of San Clemente* (2011) 201 Cal.App.4th 1256, 1274-1278; *Neighborhood Action*, *supra*, 156 Cal.App.3d at pp. 1184-1188 [issuance of a use permit is beyond the authority of the issuing agency if the general plan is deficient in its treatment of mandatory elements which are involved in the uses sought by the permit].) Before reaching the substance of Clean Energy's claims under the Planning and Zoning Law, we first dispose of procedural matters.

### A. Homewood's Forfeiture and Statutes of Limitations Contentions

Homewood urges us to disregard Clean Energy's emergency evacuation route contention related to the general plan on the ground that Clean Energy forfeited that claim by failing to cite the Subdivision Map Act in the writ petition or the trial briefs. Homewood argues, because Clean Energy did not cite the Subdivision Map Act or the consistency requirement in the writ petition, any such claim is barred by the 90-day statute of limitations (Gov. Code, § 66499.37) applicable to Subdivision Map Act claims.

However, Clean Energy did adequately tender the issue in the trial court. The writ petition alleged the general plan did not comply with Government Code section 65302's mandate to address wildfire evacuation routes, and "[t]he Board of Supervisors could therefore not find that the proposed project was consistent with the general plan." The

8

writ petition further alleged "Placer County has failed to adopt a general plan compliant with the State Planning and Zoning Law. The Board of Supervisors could not lawfully find that the proposed project was consistent with the general plan and lacked the authority to approve the project."

Clean Energy's memorandum of points and authorities in the trial court expressly cited the Subdivision Map Act, arguing, "Government Code section 66473.5 prohibits any local agency from approving a tentative map or a parcel map unless it finds that the proposed subdivision together with the provisions for its design and improvement is consistent with the general plan. [¶] . . . [¶] As the administrative record shows, the West Shore is a CalFire [*sic*] Very-High fire risk designated area. Homewood alone, as of 2007, had 1,396 single-family homes and condominium units and 80 renter occupied apartments. [Citation.] The area is served only by a two-lane, mountain road with no alternative evacuation route. . . . Traffic congestion is a significant issue under routine conditions. [Citation.] [¶] . . . [¶] Yet there is no discussion of evacuation routes . . . and consequently the West Shore [Area] General Plan is invalid for lack of substantial compliance with state law. (Gov. Code § 65302(g).) The county has failed to adopt a Safety Element that addresses evacuation routes . . . [as] related to identified fire . . . hazards. Such provisions and standards have a direct bearing on the decision concerning whether it is safe to bring a large new development to the West Shore such as the Homewood expansion project and on decisions regarding what fire . . . safety measures . . . and evacuation precautions are required in order to safely implement such a project in this very high fire-risk environment. [¶] In the absence of a valid general plan, the [Board]'s actions . . . were unlawful. The county violated Government Code section 66473.5 which prohibits it from approving a tentative parcel map without a finding of consistency with the general plan. The county could not make the requisite finding of consistency for its land use decisions in the absence of a valid general plan. The case law

9

is clear that such actions constitute a prejudicial abuse of discretion that must be set aside."

In the trial court, Homewood's opposition brief, joined by the County, responded to the consistency argument without objecting that it exceeded the scope of the pleading. Moreover, "an implicit statutory requirement that land use planning decisions comply with the general plan pervades the Planning and Zoning Law." (*Neighborhood Action*, *supra*, 156 Cal.App.3d at p. 1185.)

Buried in Homewood's respondent's brief on appeal is an assertion -- not made in the trial court -- that any Subdivision Map Act challenge is barred here because Clean Energy failed to serve a *summons* on the County within the 90-day period, as required by the Subdivision Map Act. (Gov. Code, § 66499.37.[6]) Homewood cites *Friends of Riverside's Hills v. City of Riverside* (2008) 168 Cal.App.4th 743, which held that even though there was no *summons* requirement for *CEQA* mandamus proceedings,[7] the Subdivision Map Act's requirement to serve summons within 90 days applied to any CEQA cause of action concerning a subdivision which could have been brought as a claim under the Subdivision Map Act. (*Id*. at pp. 746, 748; see also *Hensler v. City of*

---

[6] Government Code section 66499.37 provides in pertinent part: "Any action or proceeding to attack, review, set aside, void, or annul the decision of an advisory agency, appeal board, or legislative body concerning a subdivision, or of any of the proceedings, acts, or determinations taken, done, or made prior to the decision, . . . shall not be maintained by any person unless the action or proceeding is commenced *and service of summons effected within 90 days after the date of the decision*. Thereafter all persons are barred from any action or proceeding or any defense of invalidity or unreasonableness of the decision or of the proceedings, acts, or determinations. . . ." (Italics added.)

[7] A "summons" is signed by the court clerk, issued under the court's seal, and directs the defendant to file an answer within the specified time or face default. (Code Civ. Proc., § 412.20.) "[S]tatutes do not appear to require that a summons be served in mandamus proceedings." (*Board of Supervisors v. Superior Court* (1994) 23 Cal.App.4th 830, 834, fn. 2.)

10

*Glendale* (1994) 8 Cal.4th 1, 26-27 [Government Code section 66499.37 applies to any type of action seeking review of a legislative body's subdivision-related decision under the Subdivision Map Act].)

Clean Energy's reply brief does not directly reply to the summons issue but instead suggests Homewood is barred from raising this point for the first time on appeal. Clean Energy cites *Hilliard v. A.H. Robins Co*. (1983) 148 Cal.App.3d 374, 392, for the proposition that a party who permits a case to be tried on an assumption that the pleadings raised a certain issue cannot claim on appeal that the pleadings did not raise that issue.

We conclude the summons issue is forfeited for failure to raise it in the trial court. In civil cases, the statute of limitations is an affirmative defense that is forfeited if not appropriately invoked in the trial court. (*Adams v. Paul* (1995) 11 Cal.4th 583, 597.)

Here, neither the County nor Homewood invoked Government Code section 66499.37 in their answer to the writ petition. The County's answer to the writ petition asserted as an affirmative defense that "Petitioner is barred from bringing this action by the applicable statutes of limitations including, but not limited to, Public Resources Code § 21167." Homewood's answer to the writ petition asserted as the third affirmative defense that "[p]etitioner's claims are barred, in whole or in part, by the applicable statute of limitations." Clean Energy did not object to lack of specificity as to what code section, other than the CEQA statute, was being invoked. (Code Civ. Proc., § 458 [statute of limitations is to be pleaded by specific facts or code section number]; *Coy v. County of Los Angeles* (1991) 235 Cal.App.3d 1077, 1086, fn. 5 [section 458 is strictly construed to require specification of section number, though plaintiff's lack of diligence in objecting to lack of specificity may forfeit the matter].)

Even taking into account the fact that the writ petition did not expressly cite the Subdivision Map Act, the opposition brief filed by Homewood in the trial court and

11

joined by the County did not object when Clean Energy expressly cited the Subdivision Map Act in its trial brief.  Homewood (and the County) simply ignored the matter.

Setting aside the answers' failure to specify Government Code section 66499.37 and Clean Energy's failure to object for lack of specificity, an issue presenting factual questions generally cannot be raised for the first time on appeal.  (*Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 654, fn. 3; *Bach v. County of Butte* (1989) 215 Cal.App.3d 294, 306.)  Statutes of limitations normally present questions of fact.  (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112.)  In this case, the application of Government Code section 66499.37 definitely presents questions of fact -- (1) did Clean Energy serve a summons, and (2) if a summons was served, was it timely?  Indeed, it is not even clear from the respondent's brief on appeal whether Homewood is claiming a summons was never served or that a summons was untimely served.  Clean Energy's appendix contains only a proof of service of the writ petition, not proof of service of *summons*.  But since the summons issue was not raised in the trial court, there was no reason to include it in appellant's appendix, assuming it was served.

We conclude Clean Energy's Subdivision Map Act claim is neither forfeited nor barred by a statute of limitations.

### B.  Nexus between the General Plan and the Project

Even though Clean Energy did not file a direct attack on the General Plan within within the specified time period in 1994 and 1998 (Gov. Code, § 65009, subd. (c) [120 days in 1994 and 90 days in 1998]), a timely lawsuit challenging a legislative body's approval of a specific project may tender an issue reaching the adequacy of the general plan if there is a nexus between the specific project and alleged defects in the general plan.  (*Neighborhood Action*, *supra*, 156 Cal.App.3d at pp. 1187-1188.)  If the general plan is inadequate, the Project approval may be invalid.  (*Id*. at p. 1184.)  This is due to "the hierarchical relationship of the land use laws."  (*Ibid*.)  Local approval of a specific

12

land use is "struck from the mold" of the planning and zoning laws, which must comply with general plans, which in turn must conform to state law requirements. (*Ibid*.)

*Neighborhood Action* involved a conditional use permit for sand and gravel processing which implicated a defect in the noise element of the county's general plan. This court held that the trial court erred in sustaining a demurrer to a complaint alleging that the inadequacy of a county's general plan rendered a land use permit invalid. (*Neighborhood Action*, *supra*, 156 Cal.App.3d at pp. 1188-1190.) "[I]ssuance of a conditional use permit is ultra vires if the general plan of the issuing entity [citation] does not conform to mandatory statutory criteria which are relevant to the uses sought by the permit." (*Id*. at p. 1179, fn. omitted.) "Although use permits are not explicitly made subject to a general plan meeting the requirements of state law, that condition is necessarily to be implied from the hierarchical relationship of land use laws. . . . 'Since consistency with the general plan is required, absence of a valid general plan, or valid relevant elements or components thereof, precludes enactment of zoning ordinances, and the like.' [Citations.] . . . [¶] . . . [T]he scope of authority of the agency to enact a general plan and zoning ordinances and *to apply them* is governed by the requirements of state law. A permit action taken without compliance with the hierarchy of land use laws is ultra vires as to any defect implicated by the uses sought by the permit." (*Id*. at p. 1184.) The principles applied in *Neighborhood Action* are applicable here.

Clean Energy relies on the Subdivision Map Act, which provides in Government Code section 66473.5, "No local agency shall approve a tentative map, or a parcel map for which a tentative map was not required, unless the legislative body finds that the proposed subdivision, together with the provisions for its design and improvement, is consistent with the general plan required by [Gov. Code, § 65300 et seq.]." The County found consistency and approved the Vesting Tentative Subdivision Map for the Project. Yet "a proposed project cannot be consistent with an *invalid* general plan." (*Guardians*, *supra*, 149 Cal.App.3d at p. 598, italics added; see also *Napa Citizens for Honest*

13

*Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 389 [stating that *Neighborhood Action* establishes that an inadequate general plan may have the effect of invalidating a decision lower on the hierarchy of land use planning]; *Camp*, *supra*, 123 Cal.App.3d at p. 348 [trial court properly enjoined county from project approval until it had adopted a valid general plan].)

Here, there is a clear nexus between the Project approval and General Plan deficiency. General Plan provisions addressing wildfire evacuation routes are obviously important to a development in a high-risk fire area. The increased population created by the Project affects the ability of residents, workers, and visitors to evacuate in the event of a wildfire. The only northerly exit is across Fanny Bridge, which is already a "bottle neck" in the summertime according to the County.[8] The record shows that funding to expand Fanny Bridge was uncertain.

Homewood acknowledges the fire hazards but contends Clean Energy fails to meet its burden to show a nexus, and there is no nexus because there is evidence the Project will *reduce* fire risk. Local fire organizations lauded the Project for its fire protection activities such as debris removal and using snowmaking equipment for fire-suppression purposes. The Project approval also incorporated measures suggested by fire agencies for improving access. However, measures to assist fire prevention, suppression, and *access* for emergency vehicles, cannot guarantee there will never be fire or that a fire will be suppressed without the need to evacuate, and none of the measures intended to reduce fire risk say anything about emergency *evacuation* of residents, workers, and visitors in the event a wildfire does occur.

---

[8] The General Plan's "Background Report" notes most fires start between May and October when hot, dry weather reduces plant moisture and makes vegetation more susceptible to burning.

Homewood notes it is required to prepare as a mitigation measure an Emergency Response and Evacuation Plan, which must be consistent with a guide prepared by the North Tahoe Fire Protection District (NTFPD) and must be approved by NTFPD, the Tahoe Regional Planning Agency (TRPA), and the County Engineering and Surveying Department (ESD). We discuss this mitigation measure, *post*, but it does not negate the nexus between the Project approval and the General Plan.

We conclude there is a sufficient nexus between the Project and the General Plan to address Clean Energy's contention about deficiency in the General Plan.

## C. General Principles and Standard of Review

"While the police power is the constitutional source of local governments' land use authority, the framework for the exercise of that power is provided by the state's land use planning statutes." (*Fonseca v. City of Gilroy* (2007) 148 Cal.App.4th 1174, 1181-1182, citing Gov. Code, §§ 65100-65910.)

A general plan is the " 'basic land use charter governing the direction of future land use' " in a locality. (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 540, 542.) "It has been aptly analogized to 'a constitution for all future developments.' " (*Neighborhood Action*, *supra*, 156 Cal.App.3d at p. 1183.) A county's general plan must substantially comply with the provisions of Government Code section 65300 et seq. (*Camp*, *supra*, 123 Cal.App.3d at p. 348), and "[a]ny action to challenge a general plan or any element thereof on the grounds that such plan or element does not substantially comply with the requirements of Article 5 (commencing with Section 65300) shall be brought pursuant to [Code of Civil Procedure] Section 1085.[9]" (Gov.

---

**9** Section 1085 of the Code of Civil Procedure provides in part: "(a) A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . ." If a general plan does not substantially comply with statutes, then the county's board of supervisors and other responsible agencies have failed

Code, § 65751.)  " 'Substantial compliance . . . means *actual* compliance in respect to *the substance essential to every reasonable objective* of the statute' as distinguished from 'mere technical imperfections of form.'  [Citation.]" (*Camp*, at p. 348, second italics added.)

Government Code section 65301 sets forth the general content requirements for a general plan.  Subdivision (b) provides that "[t]he general plan may be adopted as a single document or as a group of documents relating to subjects or geographic segments of the planning area."

A general plan, as a legislative enactment of the local governing body, is presumptively valid, and the burden is on those challenging the plan to demonstrate that it is inadequate.  (*St. Vincent's School for Boys, Catholic Charities CYO v. City of San Rafael* (2008) 161 Cal.App.4th 989, 1009 (*St. Vincent*).)  The question of substantial compliance is one of law, which we review de novo.  On review, we do not evaluate the merits of the element or the wisdom of the county's policy determinations, but rather its substantial compliance with the statutes.  (*Ibid.*; see also *Twain Harte Homeowners Assn. v. County of Tuolumne* (1982) 138 Cal.App.3d 664, 674 (*Twain Harte*) ["It is clear that in reviewing the determination of the board of supervisors the court may not probe the merits of the general plan."], superseded by statute on another ground as stated in *Sierra Club v. County of San Diego* (2014) 231 Cal.App.4th 1152, 1173; *Camp*, *supra*, 123 Cal.App.3d at p. 348 [adoption of a general plan is a legislative act, and " '[s]ince the wisdom of the plan is within the legislative and not the judicial sphere, a landowner may not maintain an action in declaratory relief *to probe the merits of the plan*' "].)  We do not interfere with the exercise of the locality's discretion in making substantive

---

in the performance of an act which the law specially enjoins.  (*Camp*, *supra*, 123 Cal.App.3d at p. 348.)

determinations or conclusions. (*St. Vincent*, at p. 1009.) Thus, it is not our role to review the quality of the General Plan safety element here.

## D. Wildfire Evacuation Routes[10]

It is undisputed that wildfires are a substantial threat to the West Shore, including the Project area. Therefore, the General Plan's safety element must "address evacuation routes." (Gov. Code, § 65302, subd. (g)(1).) Clean Energy complains the General Plan fails to "address" wildfire evacuation routes as required by Government Code section 65302, subdivision (g)(1).[11] Clean Energy essentially argues that the Legislature intended in section 65302, subdivision (g)(1), to require counties "at the least to expressly discuss what routes people would use to evacuate and to consider those routes in view of the other elements of the general plan." We disagree. While we do not comment on the merits, wisdom or quality of the General Plan or how it has dealt with evacuation routes therein, given the plain meaning of the statute, we must conclude that the General Plan substantially complies with the requirement to "address evacuation routes."

### 1. The Meaning of "Address"

Government Code section 65301 sets forth the required contents of a general plan. Section 65302 discusses the elements that must be included in a general plan. Subdivision (c) of section 65301 provides in pertinent part: "The general plan shall

---

[10] Homewood's request for judicial notice of legislative materials is granted.

[11] In an argument heading, Clean Energy writes, "The General Plan Fails to Address Evacuation Routes, Peakload Water Supply, Minimum Road Widths or Clearances Around Structures." However, Clean Energy provided substantive factual and legal analysis only as to evacuation routes. Therefore, to the extent Clean Energy intended to contend the general plan is invalid for the failure to address these other issues, we reject that contention. We may properly disregard contentions perfunctorily asserted without development. (*People v. Carroll* (2014) 222 Cal.App.4th 1406, 1412, fn. 5; *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1396-1397; *Tilbury Constructors, Inc. v. State Comp. Ins. Fund* (2006) 137 Cal.App.4th 466, 482; *Placer Ranch Partners v. County of Placer* (2001) 91 Cal.App.4th 1336, 1343, fn. 9.)

*address* each of the elements specified in Section 65302 to the extent that the subject of the element exists in the planning area. The *degree of specificity and level of detail* of the discussion of each element *shall reflect local conditions and circumstances*." (Italics added.) Section 65302, subdivision (g)(1), discusses the safety element of a general plan, and requires that the safety element "*address* evacuation routes" related to "identified fire . . . hazards." (Italics added.) "Address" must have the same meaning in both statutes. (*People v. Roberge* (2003) 29 Cal.4th 979, 987 [identical words used in different parts of the same act are intended to have the same meaning].) However, neither statute defines the verb "address," and the parties have pointed us to no statute that does.[12] Nor has our independent research revealed a statutory definition of "address." That word, however, is critical to understanding the treatment a general plan must give to evacuation routes.

"Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737; see *San Leandro Teachers Assn. v. Governing Bd. of San Leandro Unified School Dist.* (2009) 46 Cal.4th 822, 831.)

---

**12** We directed the parties to provide supplemental briefing on the question, "What is the meaning of the word 'address' in Government Code sections 65301, subdivision (c) and 65302, subdivision (g)?"

Here, we need look no further than the common definition of "address." In this context, the verb "address" means "to give attention to (something)" or "to deal with (a problem, issue, etc.)." (Merriam-Webster Unabridged (2015 Merriam-Webster, Inc.) <http://unabridged.merriam-webster.com/unabridged/address> [as of December 17, 2015].) Given the language in Government Code section 65301, subdivision (c), the "degree" to which the plan must "give attention to" or "deal with" the matter of evacuation routes and "level of detail" of that discussion must "reflect local conditions and circumstances." Prior to the current General Plan, the Legislature had provided no other requirements as to what must be considered or otherwise set forth in the general plan regarding evacuation routes. As noted, our review of the General Plan is limited to whether it substantially complies with the requirements of the Government Code. (*Twain Harte*, *supra*, 138 Cal.App.3d at p. 674.) We do not probe into the merits of the plan. (*Ibid*.)

Clean Energy asserts that Government Code section 65302, subdivision (g)(1), requires more, despite express language describing what is specified. Clean Energy asserts that "[t]he plain meaning of the requirement to 'address evacuation routes' is at the least to expressly discuss what routes people would use to evacuate and to consider those routes in view of the other elements of the general plan." Clean Energy made the same argument in the trial court, and the trial court ruled that Government Code section 65302, subdivision (g)(1), does not by its plain language require *identification* of evacuation routes. On this point, we agree with the trial court. On appeal, Clean Energy expands its definition, asserting that given the local circumstances, "where a significant evacuation issue is evident, the statute requires a *reasonably detailed* discussion of the issue." (Italics added.) Still further, Clean Energy asserts " 'address' means to provide a *reasonably robust* discussion of wildfire evacuation for the West Shore." (Italics added.) We find no support for this meaning in the law. As the trial court observed, Clean Energy seeks more than is required by the statute. Indeed, the definition of "address" that

19

Clean Energy espouses on appeal -- reasonably detailed or reasonably robust -- would involve a judgment about the merits of the General Plan. As we have said, that is not our role.

In our view, had the Legislature intended the safety element to discuss the specific evacuation routes and consider those routes relative to the other elements of the general plan, the Legislature would have expressly stated as much in the statute. The Legislature has proven that when it wants specific information in the general plan, it says what it wants. For example, current Government Code section 65302, subdivision (g)(1), requires the safety element to include "mapping of known seismic and other geological hazards." Yet, to this day, the Legislature has not mandated that the safety element include mapping or identification of specific evacuation routes; nor has any statute ever stated that the safety element must specify requirements for those routes.

However, recently, the Legislature did require more than had previously been required. In 2012, the Legislature enacted Senate Bill No. 1241, which added subdivision (g)(3) to Government Code section 65302. Subdivision (g)(3) requires local agencies to review and update their general plan safety elements "as necessary to address the risk of fire for land classified as state responsibility areas . . . and land classified as very high fire hazard severity zones." This review "shall consider" the advice in the Office of Planning and Research's (OPR) publication of Fire Hazard Planning, General Technical Advice Series.[13] Subdivision (g)(3) also lists specific information that shall be

---

[13] OPR has the statutory duty to "provide planning assistance to[] city, county, district, and regional planning agencies" and "[a]ssist local government in land use planning." (Gov. Code, § 65040, subds. (*l*)-(m).) OPR "shall develop and adopt guidelines for the preparation of and the content of the mandatory elements required in city and county general plans . . . ." (Gov. Code, § 65040.2, subd. (a).) These guidelines are advisory, not mandatory, as stated in Government Code section 65040.2, subdivision (c), which provides: "The guidelines shall be advisory to each city and county in order to provide assistance in preparing and maintaining their respective general plans."

20

considered in the review and update, although it does not mention "evacuation routes." It does provide that local agency's review shall include, "Designing adequate infrastructure if a new development is located in a state responsibility area or in a very high fire hazard severity zone, including safe access for emergency response vehicles, visible street signs, and water supplies for structural fire suppression." (Gov. Code, § 65302, subd. (g)(3)(C)(iii).) Apparently, the Legislature is leaving the detail and specifics of addressing evacuation routes up to the local agency's consideration of the OPR publication.[14]

---

[14] In the section of the Safety Element discussion specific to "Fire Hazard," the OPR General Plan Guidelines state: "The safety element must identify urban fringe and rural-residential areas that are prone to wildland fire hazards. It must also analyze systems, such as adequate evacuation routes . . . ." (OPR General Plan Guidelines (2003) at p. 91 <http://opr.ca.gov/docs/General_Plan_Guidelines_2003.pdf> [as of December 17, 2015].)

OPR also has in place a supplement to the General Planning Guidelines, titled, "FIRE HAZARD PLANNING, General Plan Technical Advice Series," dated November 2003. (OPR Fire Hazard Planning Guidelines (2003) <http://opr.ca.gov/docs/Fire_Hazard_Planning-Final_Report.pdf> [as of December 17, 2015].) This is the publication to which the Legislature refers in the 2012 amendment to Government Code section 65302, subdivision (g). Under the heading "Emergency Evacuations," this publication lists "data that may be useful in establishing a current picture of local need and potential response strategies for emergency evacuations related to wildfire," including: "Identify previously designated emergency evacuation routes. [¶] Identify the number of people who currently use these routes. [¶] Develop a projected increase of people who would need to use these routes over the next ten years. [¶] Identify potential circulation improvements necessary to avoid unacceptable community risks. [¶] Evaluate the availability and access of signed routes for use by evacuees and response vehicles during a fire emergency. [¶] Identify potential availability of alternate routes. [¶] Identify the adequacy of the access and evacuation routes relative to the degree of development or use (e.g., road width, road type, length of dead-end roads, turnouts, etc.) (Public Resources Code (PRC) 4290.) [¶] Evaluate the potential for disruption to evacuation routes from fire, landslide movement, fault ruptures, earthquake-triggered failures, volcanic eruption and other hazards. [¶] Identify the location and capacity of existing emergency shelters. [¶] Estimate the need for expanded capacity at existing shelters or the need for additional emergency shelters.

The County adopted the Project here in 2011, so the 2012 legislation does not apply in our analysis here. Consequently, we must consider whether the General Plan substantially complies with the version of Government Code section 65302, subdivision (g)(1), in effect when the County approved the Project. Given the definition of "address" we have discussed, we conclude that it does.

Clean Energy relies on *Twain Harte*, *supra*, 138 Cal.App.3d 664 and *Camp*, *supra*, 123 Cal.App.3d 334 to support its assertion that "items specifically called out for discussion" under Government Code section 65302 must be discussed in detail in the general plan. However, both cases involved different subdivisions in section 65302 and what was "called out" in those subdivisions did require discussion that was absent from the general plans under review.

In *Twain Heart*, the plaintiffs sought to compel the county to set aside a new general plan and prepare and adopt one that complied with Government Code section 65302. (*Twain Harte*, *supra*, 138 Cal.App.3d at p. 672.) On appeal, the court reviewed the county's compliance with subdivision (a) of Government Code section 65302, the

Shelter needs include residents, workers, campers, tourists and other people reasonably expected in the area." (*Id*. at p. 9.) The Supplemental Guidelines continue, "Based upon the data and analysis of various scenarios for emergency evacuations at the local level, policies should be developed appropriate for local conditions. Issues which policy makers may wish to consider include, but are not limited to, the cost for retrofitting evacuation routes relative to sheltering in place, public awareness of evacuation routes, maintain the availability of evacuation routes and unique conditions relative to specified land uses or special needs populations. The following are examples of policies that a local government might adopt with regards to emergency evacuations: [¶] The county shall designate and maintain safe emergency evacuation routes from all communities and assets at risk. [¶] The county shall establish a unified road signing and street addressing system. [¶] The county shall establish and maintain low risk fire safety areas (location) and/or emergency shelters. [¶] The county shall establish a public information program educating the public on evacuation routes and fire safety. [¶] The county shall provide for broad public access to information regarding evacuation routes. [¶] The county shall establish minimum road widths and flammable vegetation clearances for evacuation routes. (PRC Sections 4290 and 4291)" (*Id*. at pp. 9-10.)

22

land use element. That section requires a statement of the "standards of population density and building intensity" recommended for areas covered under the general plan. The county's general plan did not include a statement about population density; the county contended that the measurement of dwelling units per acre met the requirement for that standard. (*Id*. at p. 697.) In determining the definition of " 'population density,' " the court concluded that the Legislature could not have intended the terms " 'population density' " and " 'building intensity' " to be synonymous and held that population density refers to numbers of people in a given area. (*Id*. at pp. 698-699.) Based on that definition, the *Twain Harte* court held the land use element was deficient, because it did not include a statement of standards for population density based upon numbers of people. (*Id*. at p. 699.) The court also concluded that the statement of building intensity was deficient, reasoning that the plan's reference to minimum lot sizes and general use captions, such as " 'commercial-neighborhood,' 'commercial-shopping center,' 'commercial-visitor serving,' 'light industrial' and 'heavy industrial' " were insufficient. (*Ibid*.) Such vague labels provided no standards as to possible restrictions such as height or size limitations, restrictions on types of buildings or uses to be permitted within a designated area. (*Ibid*.) The *Twain Harte* court also reviewed the plan's circulation element required by section 65302, subdivision (b)(1). Under that provision, the plan was to have " '[a] circulation element consisting of the general location and extent of existing and proposed major thoroughfares, transportation routes, terminals, and other local public utilities and facilities, *all correlated with the land use element of the plan*." (*Twain Harte*, at p. 700.) The *Twain Harte* court observed that the circulation element did not describe or discuss the changes or increases in demands on the various roadways or transportation facilities of the county as a result of changes in uses of land and concluded there was no way to determine whether the circulation element is *correlated* with the proposed land use element. (*Id*. at p. 701.)

23

In *Camp*, *supra*, 123 Cal.App.3d 334, the court reviewed compliance with the land use element requirements in Government Code section 65302, subdivision (a). The *Camp* court held that the county's plan did not meet the requirement to specify both the population density and building intensity. Figures for population density were stated in the plan for only two areas classified in the plan, and not for other classified areas. (*Camp*, at pp. 349-350.) Nothing was said regarding "building intensity" standards. The court also reviewed the plan's housing element, which pursuant to section 65302, subdivision (c), was to consist of " 'standards and plans for the improvement of housing and for provision of adequate sites for housing,' " and further provided that the housing element was to include " 'adequate provisions for the housing needs of all economic segments of the community.' " (*Camp*, at p. 350.) The plan included what amounted to an inventory of housing in the county, but it did not include the standards and plans required by the statute or anything that could be reasonably construed as providing for the housing needs of all economic segments of the community. (*Id*. at p. 351.) Further, the noise element required by former subdivision (g) of Government Code section 65302 was not in substantial compliance because it failed to include the specific noise exposure information required by the statute. Under that provision, the plan was required to quantify the community noise environment in terms of noise exposure contours for both near-term and long-term levels of growth and traffic activity, as well discuss "an array of other factors which the element 'shall include' (or which 'must be presented' or 'must be shown' in it)." (*Camp*, at pp. 351-352.) The county's plan did not contain the " 'noise exposure information . . . presented' in the technical nomenclature ('CNEL' and 'Ldn')" and other specific information required by the statute. (*Id*. at p. 352.)

As can be seen, the general plan elements in *Twain Harte* and *Camp* required specific standards and/or information -- population density and building intensity data, information correlating the circulation element with the land use element, specific discussion relating to the housing needs of all economic segments of the community, and

24

specific, technical noise exposure information. The version of Government Code section 65302, subdivision (g)(1), applicable here, on the other hand, does not call for standards to be set forth or require discussion of specific information. It merely requires that the safety element "address evacuation routes." Thus, *Twain Harte* and *Camp* do not support Clean Energy's position. To the contrary, the provisions at issue in those cases are examples of what the Legislature does when it wants discussion about standards or specific information in the general plan -- it expressly states what it wants. The Legislature was not so specific with subdivision (g)(1) of Government Code section 65302 in effect when the Project was approved here.

At oral argument, Clean Energy focused on the introductory language at the beginning of Government Code section 65302, which reads: "The general plan shall consist of a statement of development policies and shall include a diagram or diagrams and text setting forth objectives, principles, standards, and plan proposals." From this language, Clean Energy argues the safety element must include " 'development policies,' " and " 'include a diagram or diagrams and text setting forth objectives, principles, standards, and plan proposals' " (underscoring omitted) regarding wildfire evacuation planning. Clean Energy reads too much into this introductory language, which merely states what a general plan should generally include. And Clean Energy cites no authority supporting its reading that this introductory language is intended to set out specific requirements for each element. Indeed, the language does not expressly state that each element must include, for example, "development policies" or "diagrams." Rather the introductory language goes on to state that "[t]he plan shall include the following elements" and then expressly states what is required for each of those elements. As the *Twain Harte* and *Camp* courts did, we look to the specific language in the element at issue to determine the Legislature's specific requirements, and the language of the element at issue here merely requires the agency to "address evacuation routes."

25

Given the plain language in the version of Government section 65302, subdivision (g), applicable here, we construe "address evacuation routes" in fire-hazard areas to mean that the local agencies in such areas must give "attention to" or "deal with" the matter of evacuation routes in some manner. Consistent with the Legislature's mandate in Government Code section 65301, subdivision (c), the degree of specificity and level of detail of the discussion should "reflect local conditions and circumstances." But the Legislature had not mandated specific information in the version of Government Code section 65302, subdivision (g)(1), in effect when the Project was approved, and we will not place ourselves in the position of the Legislature by reading such a mandate into the former law. Further, we reject the amorphous requirement apparently suggested by Clean Energy -- "reasonably detailed" or "reasonably robust" discussion -- as unworkable and requiring courts to judge the wisdom or merits of the safety element when the Legislature, by its statutory language, apparently intended to give local agencies broad discretion in "addressing" evacuation routes. In reaching this conclusion, we are mindful that the OPR also apparently understands that local agencies have discretion concerning the contents of the safety element. In the General Plan Guidelines, the OPR writes, "Communities may use the safety element as a vehicle for defining '*acceptable risk*' and the basis for determining the level of necessary mitigation." (OPR General Plan Guidelines (2003) at p. 90 <http://opr.ca.gov/docs/General_Plan_Guidelines_2003.pdf> [as of December 17, 2015], italics added.)

We now turn to the General Plan documents at issue in this case.

**2. The General Plan Documents**

The General Plan consists of two documents which operate together: (1) The "PLACER COUNTY GENERAL PLAN" -- which we refer to as the "Countywide General Plan," adopted in 1994 and (2) a "community plan" titled West Shore Area

26

General Plan,[15] adopted in 1998. A "community plan," as explained in the Countywide General Plan, operates in conjunction with the Countywide General Plan. "The community plans generally address the same topics or issues addressed in the Countywide General Plan. In some cases, however, a community plan addresses local issues not discussed in the Countywide General Plan, and in other cases a community plan covers a narrower range of discussion than does the Countywide General Plan. [¶] The goals and policies contained in the community plans are intended to supplement and elaborate upon the goals and policies of the Countywide General Plan . . . ." The Resolution adopting the West Shore Area General Plan notes its consistency with the Countywide General Plan.

### a. The Countywide General Plan

The Countywide General Plan, adopted in 1994, states it "consists of two documents: the General Plan Background Report and the General Plan Policy Document." The General Plan Policy Document contains a "Health and Safety" element, which states as Goal 8.C the goal to "minimize the risk of loss of life, injury, and damage to property and watershed resources resulting from unwanted fires." The Countywide General Plan sets forth policies implementing Goal 8.C:

"8.C.1. The County shall ensure that development in high-fire-hazard areas is designed and constructed in a manner that minimizes the risk from fire hazards and meets all applicable state and County fire standards.

"8.C.2. The County shall require that discretionary permits for new development in fire hazard areas be conditioned to include requirements for fire-resistant vegetation, cleared fire breaks, or a long-term comprehensive fuel management program. Fire hazard

---

[15] The plan is entitled "West Shore Area General Plan" rather than "community plan" in order to avoid a nomenclature conflict with TRPA regulations.

reduction measures shall be incorporated into the design of development projects in fire hazard areas.

"8.C.3.  The County shall require that new development meets state, County, and local fire district standards for fire protection.

"8.C.4.  The County shall refer development proposals in the unincorporated County to the appropriate local fire agencies for review for compliance with fire safety standards.  If dual responsibility exists, then both agencies shall review and comment relative to their area of responsibility.  If standards are different or conflicting, the more stringent standards shall be applied.

"8.C.5.  The County shall ensure that existing and new buildings of public assembly incorporate adequate fire protection measures to reduce the potential loss of life and property in accordance with state and local codes and ordinances.

"8.C.6.  [Increase public awareness of fire hazards.]

"8.C.7.  The County shall work with local fire protection agencies, the California Department of Forestry and Fire Protection, and the U.S. Forest Service to promote the maintenance of existing fuel breaks and emergency *access routes for effective fire suppression*.

"8.C.8.  [Promote installation and maintenance of smoke detectors.]

"8.C.9.  [Develop fire prevention programs.]

"8.C.10.  [Enforce fire safety standards in the County's Land Development Manual.[16]

---

[16]  Homewood does not mention the land development manual and does not contend it addresses emergency evacuation routes.  Our review of the 43,000-page administrative record reveals only a two-page document titled Land Development Manual which merely lists various sections, none of which expressly refer to emergency evacuation routes.

"8.C.11. [Continue to cooperate with the California Department of Forestry and Fire Protection and local fire protection agencies in managing wildland fire hazards.]

"8.C.12. [Support annexations and consolidation of fire districts and services.]" (Italics added.)

While these policies discuss fire safety, fire prevention and even access routes for emergency responders, none of the policies mention evacuation routes. Indeed, there are no policies that expressly mention evacuation at all.

Goal 8.C cross-references Goal 4.I, Fire Protection Services. Goal 4.I is to "protect residents of and visitors to Placer County from injury and loss of life and to protect property and watershed resources from fires." The policies stated under this goal relate to matters such as the: minimum number of fire protection agencies; average response time; use of fire detection, control, and suppression systems; and requiring new development to comply with fire safety standards and fund fire protection facilities. Goal 4.1 does not expressly mention evacuation routes.

Other elements of the Countywide General Plan indicate the plan is to consider the future, including increased population from anticipated new development. However, none of these other elements expressly mention evacuation routes. For example, the "General Land Use" element states a general goal (Goal 1.A): "To promote the wise, efficient, and environmentally-sensitive use of Placer County lands to meet the present *and future* needs of Placer County residents and businesses." (Italics added.) The General Plan's introduction to its "Housing" element states, "The general plan serves as a blueprint for community growth and change." It also noted the housing element is subject to periodic updates mandated by statute (Gov. Code, § 65588), to address "both current conditions[] and evolving community expectations about the future." The General Plan's "Transportation and Circulation" element states its goal (Goal 3.A): "To provide for the long-range planning and development of the County's roadway system to ensure the safe and efficient movement of people and goods." The General Plan's

29

"Background Report" speaks of identification of fire hazards, the roles of various fire protection agencies, and minimum standards of fire safety, i.e., ensuring emergency *access* (minimum road width of 18 feet, etc.), visibility of signs and building numbers, water sources, and fuel modifications to reduce fire intensity by reducing density of flammable vegetation.

Nothing in the Countywide General Plan speaks directly to evacuation routes.

**b. The West Shore Area General Plan**

The West Shore Area General Plan, adopted in 1998, describes the areas of known wildland fire hazards and identifies the three major entities involved in fire safety: (1) the North Tahoe Fire Protection District (NTFPD); (2) the United States Forest Service (USFS); and (3) the California Department of Forestry and Fire Protection (Cal Fire).

The West Shore Area General Plan states the following policies related to fire: "Ensure that all proposed developments are reviewed for fire safety standards by local fire agencies responsible for its protection, including providing adequate water supplies and ingress and egress.[17] [¶] Maintain strict enforcement of . . . the Uniform Fire Code. [¶] Inform residents and visitors of the wildfire hazards associated with occupancy in the [Lake Tahoe] basin. Encourage the use of fire resistant materials and fire preventative techniques when constructing structures, especially in the highest fire hazard areas.

---

**17** The dictionary defines "egress" as "a place or means of going out: EXIT." (Merriam-Webster Unabridged (2015 Merriam-Webster Inc.) <http://unabridged.merriam-webster.com/unabridged/egress> [as of December 17, 2015].) However, it is debatable whether the policy in the West Shore Area General Plan referencing this word "addresses" evacuation routes. Given the reference to the provision of "adequate water, supplies, ingress and egress," as apparent topics for the review of projects for "fire safety standards," the focus of this policy appears to be egress by fire protection agencies that may be called upon to protect against or fight fires, not evacuation routes for the public. Moreover, as Clean Energy points out, the fire safety standards referenced in this provision are not in the record. In any event, as we discuss *post*, the General Plan does "address evacuation routes," in another document.

Manage forest fuels to be consistent with state laws and other goals and policies of this Plan."

An appendix to the West Shore Area General Plan, under the heading "The Standards & Guidelines for Signage, Parking and Design," states as a standard condition that "[a]ll projects shall meet the fire protection features deemed necessary by the Fire District or the appropriate fire protection authority."

As is the case with the Countywide General Plan, the West Shore Area General Plan does not expressly mention evacuation routes.

### 3. Other Documents

As we have noted, Government Code section 65301, subdivision (b), provides: "The general plan may be adopted as a single document or as a group of documents relating to subjects or geographic segments of the planning area." The Countywide General Plan refers to the County's Emergency Operations Plan (EOP), which is to help the County "prepare for, respond to, recover from, and mitigate the effects of natural and technological disasters."[18] The Countywide General Plan states: "The County shall continue to maintain, periodically update, and test the effectiveness of its Emergency Operations Plan." As the trial court noted, the EOP discusses a plan for coordination of emergency response and evacuation in this high-fire hazard area. The EOP recognizes that the mountainous, heavily-forested eastern portion of the county is at particularly high risk for wildland fires due to "(1) the long hot season of high temperatures and low humidity, (2) high winds coupled with the rugged terrain, and (3) highly flammable timber and thick underbrush (fuel)." The EOP speaks of "vehicular evacuation" in "ANNEX C [¶] MASS EVACUATION." Annex C refers to " '[m]ass evacuation' " as "a movement of a significant number of persons, by vehicle into and through Placer

---

[18] The EOP contained in the record is dated December 14, 2010, but states it updates and replaces an EOP dated May 11, 2004.

County . . . ." It goes on to state that the "[u]ltimate authority for *movement control on roadways* rests with California Highway Patrol (CHP), and secondarily with other law enforcement agencies such as the Sheriff or city police departments operating as mutual aid to CHP. Depending on the scale of the evacuation, CHP and even local law enforcement may not have adequate personnel to completely manage a large mass evacuation. Therefore, additional law enforcement assistance will be coordinated via the (EMO) [Emergency Management Organization]. Requests of the EMO are projected to be *primarily for signage, stanchions, physical barriers, or staffing, etc. for use in Traffic Control Points (TCP) to expedite traffic flow, traffic work-arounds, and prevent gridlock. The underlying principle of a mass evacuation is to keep evacuees moving as smoothly and as safely as possible, without assistance, into safe areas in or adjacent to the County.*" The EOP describes the function of "Evacuation Coordination and Assistance Points (ECAP)," stating that they serve as a " '*pit stop*' " (italics added) *in mass vehicular evacuations*, similar to those at race tracks where evacuating vehicles can stop temporarily. ECAPs will be situated "[a]djacent to the main evacuation route." The EOP further states, "Time permitting[,] CHP and any mutual aid law enforcement resources plan and execute a mass evacuation in such a manner as to preclude the problems mentioned above. Priority for movement will be to evacuees from areas in the most immediate danger, a decision that is the responsibility of the Incident Commander. For spontaneous evacuations, Incident Command requests assistance through the EMO once it is established. The ECAP, once established, is another probable source of requests and the probable location for the provision of support. If a shortage of local resources is encountered, the EMO prioritizes local resource requests and requests State support through the REOC [Regional Emergency Operations Center]."

The EOP expressly states that adoption of community evacuation plans and other emergency plans "contributes to pre-disaster preparedness."[19]  In April 2008, the County adopted the East Side Emergency Evacuation Plan (ESEEP[20]) which is an evacuation plan for the eastern portion of the County.  It does not include the Tahoe National Forest or the Lake Tahoe Basin Management Unit but does apply to evacuations necessitated by incidents that start there and threaten County areas.  In addition to the EOP, the trial court cited the ESEEP in concluding that the General Plan addresses evacuation routes.

The Letter of Promulgation for the ESEEP states it "helps ensure higher survivability by coordinating individual agency plans and the County [EOP] for evacuations brought on by a larger disaster or emergency incident."  There are other references to the EOP in the ESEEP.  The ESEEP states, "[F]orest fire remains the greatest single threat to communities.  For all but the wettest of months, homes and businesses in wildland-urban interface areas are particularly susceptible to fire damage and destruction.  During fire season, the combination of dense forests, heavy fuel loads, low humidity, potential for high winds and the steep terrain in the Sierra Nevadas can rapidly turn even small fires into lethal, major disasters.  Despite a record of very

---

[19]  The EOP, section 13.0, labeled "PRE-DISASTER PUBLIC AWARENESS AND EDUCATION," states, "Individual, family and community pre-disaster preparedness is the cornerstone of a community's success in reducing loss of life and property when faced with a potentially catastrophic incident.  Placer County's Local Hazard Mitigation Plan, various Community Wildfire Protection Plans, Flood Control efforts, Emergency Action Plans, *community Emergency or Evacuation Plans* and the efforts of all public safety and many other agencies to improve safety education and awareness *contributes to pre-disaster preparedness*.  Ongoing, *coordinated pre-disaster preparedness efforts are a priority* for Placer County and its political sub-divisions and prove time after time to be decisive in emergency response and recovery."  (Italics added.)

[20]  The trial court, at the request of both sides, took judicial notice of the EOP and the ESEEP, and the trial court's order notes Clean Energy reiterated at the hearing that it had no objection to the court reviewing the documents.  We consider both documents, despite appellant's argument that the ESEEP is not part of the General Plan.

successful evacuations in the past, *the limited number of roads in the area always makes evacuations problematic.*  The need to quickly execute a rapid evacuation of residents, businesses, transients, and even pets, requires detailed planning, de-confliction of response actions, and cooperation between first responders and supporting agencies alike.  [¶]  Therefore, in order to meet this planning challenge, the Placer County Sheriff's Office (PCSO), the five eastern Fire Protection Districts/Departments, California Highway Patrol (CHP), USDA Forest Service (USFS), American Red [C]ross (ARC), the County Office of Emergency Services (OES) and other state and federal contributing agencies developed this plan to help increase preparedness, and *facilitate the efficient and rapid evacuation of threatened communities* in the far eastern end of the County. . . ."  (Italics added.)  The ESEEP states its purpose is to "prescribe[] specific responsibilities for first responders, County staff and other state, federal and non-profit contributing agencies for conducting an emergency evacuation."

Regarding evacuation routes, the ESEEP states:  "*The primary roads in the area*, Interstate 80 (I-80) *and State Highways 28, 89 and 267* comprise the major evacuation routes.  *Depending on the location and movement of the incident, the Unified Command designates which* [*route*] *is or are to be used for evacuation and which for emergency vehicle ingress and egress.*  When necessary, surface streets will also be designated for evacuees and for emergency vehicle traffic."  (Italics added.)

The ESEEP designates evacuation routes for the existing Resort and other areas in the eastern side of the County.  The ESEEP shows there are only two evacuation routes from the Resort area -- SR 89 northbound and SR 89 southbound.

As can be seen from our summary, the ESEEP speaks of evacuations in the sense of managing evacuations on existing roads.  It does not speak of evacuation routes in the sense of assuring that roads have the capacity to evacuate residents and visitors safely.

34

### 4. Analysis

Clean Energy argues the General Plan is inadequate in that it fails to address evacuation routes in wildfire hazard areas. The consequence of this purported inadequacy, in Clean Energy's view, is that approval of this Project is invalid because a project must be consistent with a general plan, but a project cannot be consistent with an inadequate general plan. As Clean Energy puts it, "a large number of new residents and tourists are being added to the West Shore without a commensurate increase in the capacity of the roads to serve in the event of an emergency evacuation." But Clean Energy's argument goes to the adequacy of the evacuation policy, the adequacy of evacuation routes and whether the specifics of the evacuation planning are sufficient to protect the number of people in the area in the event of a wildfire. There are at least two things wrong with this argument. First, while a general plan contemplates future development, it need not and cannot address specific future projects. Indeed, this project was not even contemplated when the Countywide General Plan was adopted in 1994 or when the West Shore Area General Plan was adopted in 1998. Second, as we have noted, our role is not to review the quality of the plan or whether it adequately advances the policies regarding its safety element. How the County "addresses" evacuation plans is a matter left up to the discretion of the County. And as OPR has stated, it is up to the local agency to determine the "acceptable risk." (OPR General Plan Guidelines (2003) at p. 90 <http://opr.ca.gov/docs/General_Plan_Guidelines_2003.pdf> [as of December 17, 2015].)

As we have noted, the trial court cited the EOP and the ESEEP in rejecting Clean Energy's general plan claim. Clearly, the EOP "addresses" evacuation routes in the sense that it "gives attention" to the subject or stated differently, "deals with" the problem of evacuation routes. And the degree of detail of the EOP's treatment of evacuation routes "reflect local conditions and circumstances" as required by Government Code section 65301, subdivision (c). While Clean Energy may not like the level of attention or depth

35

to which the EOP deals with evacuation routes, we do not judge the wisdom or merits of the plan. (*St. Vincent*, *supra*, 161 Cal.App.4th at p. 1009; *Twain Harte*, *supra*, 138 Cal.App.3d at p. 674.)

The EOP discusses the control of the movement on roadways, stating that such movement will be controlled primarily by CHP and secondarily by other law enforcement agencies. The EOP states that the EMO will handle "signage, stanchions, physical barriers, or staffing, etc. for use in Traffic Control Points (TCP) to expedite traffic flow, traffic work-arounds, and prevent gridlock." It discusses the ECAPs " 'pit stop[s]' " adjacent to evacuation routes. It states that the "[m]ass evacuation" policy of the County is "to keep evacuees moving as smoothly and as safely as possible, without assistance, into safe areas in or adjacent to the County." It further states that the "[p]riority for movement will be to evacuees from areas in the most immediate danger." Thus, the EOP, which is expressly referenced in the Countywide General Plan, addresses evacuation routes and thus satisfies Government Code section 65302, subdivision (g)(1).

Clean Energy points out that the ESEEP, which discusses evacuation routes in even greater detail, is not part of and not specifically referenced in the Countywide General Plan. That is true. As noted earlier, Government Code section 65301, subdivision (b), provides that "[t]he general plan may be adopted as a single document or as a group of documents relating to subjects or geographic segments of the planning area."

Citing *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 743 (*Kings County*), Clean Energy argues that the ESEEP cannot serve to satisfy the Government Code section 65302, subdivision (g)(1), requirement to "address evacuation routes" because it is not referenced in the Countywide General Plan. In *Kings County*, the court observed that under Government Code section 65301, a plan may properly consist of several documents, but the plan must be logically organized. (*Kings County*, at p. 744.) The court went on to say, "If missing information critical to an adequate

36

discussion of statutory criteria is to be supplied through documents outside the general plan, a *clear reference to the outside documents must appear in the challenged elements*. Otherwise, it is difficult, at best, to identify standards essential to evaluate proposed uses and conditions which should be imposed upon such uses. We conclude a deficient element cannot be saved by consideration of documents which are not relied upon in the discussion of that element." (*Ibid*., italics added.) The court concluded that because there was "no reference to" the other documents upon which the county relied in the general plan, those documents could not be considered in determining whether the plan was in substantial compliance with Government Code section 65302. (*Kings County*, at p. 744.)

Our case is a little different. As we have noted, the EOP addresses evacuation routes and it is referenced in the General Plan. The EOP expressly states adoption of community evacuation plans and other emergency plans "contributes to pre-disaster preparedness." Consistent with that statement in the EOP, the County adopted the ESEEP, which also addresses evacuation routes. And the ESEEP contains several references to the EOP, including a statement that the ESEEP "helps ensure higher survivability by coordinating individual agency plans and the County Emergency Operations Plan." Nevertheless, there is not a "clear reference" specifically to the ESEEP in the Countywide General Plan, the West Shore Area General Plan or the EOP. Without "a clear reference" in at least one of those three documents, the ESEEP cannot be considered in determining whether the County's plan is in substantial compliance. (*Kings County*, *supra*, 21 Cal.App.3d at p. 744.) Nevertheless, even if the ESEEP could not be considered a general plan document, the EOP, as we have seen, suffices to satisfy Government Code section 65302, subdivision (g)(1) requirement that the General Plan "address evacuation routes."

Clean Energy contends we should look to the OPR Fire Safety Guidelines, which supplement the General Plan Guidelines, to determine whether the General Plan

substantially complies with the safety element requirement to "address evacuation routes."[21]  Several courts have said the OPR guidelines, although advisory and not mandatory, provide assistance in determining whether general plan elements substantially comply with the requirements of Government Code section 65302.  (*Corona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th 985, 994, fn. 6; *Twain Harte*, *supra*, 138 Cal.App.3d at p. 702; *Camp*, *supra*, 123 Cal.App.3d at p. 351.)  Clean Energy points out that the Countywide General Plan and the West Shore Area General Plan do not discuss any of the wildfire evacuation issues that the Fire Safety Guidelines say should be considered in developing general plan objectives, policies and standards. (See fn. 14, *ante*.)  Homewood argues that the guideline publication should not be used to measure substantial compliance in this case.  We agree with Homewood on this point.

As Homewood points out, OPR's Fire Safety Guidelines were published in 2003, nine years after the County adopted its Countywide General Plan in August of 1994 and five years after the adoption of the West Shore Area General Plan in October of 1998. Moreover, the introduction section to the Fire Safety Guidelines indicates that there was no requirement to update general plans, thus suggesting that OPR did not envision this publication to operate retroactively.  In the introduction, OPR wrote that it "encourages Fire Safe Councils, concerned citizens, elected officials, fire authorities and city and county planners to *use the opportunity of an update* to the General Plan to better integrate local fire hazard mitigation plans with the General Plan."  (OPR Fire Hazard Planning Guidelines (2003) at p. 1 <http://opr.ca.gov/docs/Fire_Hazard_Planning-Final_Report.pdf> [as of December 17, 2015], italics added.)  None of the cases that have

---

[21]  We asked for supplemental briefing which included the following question:  "What role, if any, does the Fire [Safety Guidelines] . . . play in determining whether emergency evacuation has been 'addressed' within the meaning of Government Code section 65302, subdivision (g) or whether there has been substantial compliance with that provision?"

38

looked to the OPR Guidelines in determining the question of substantial compliance have said the Guidelines could be applied retroactively for that purpose. The County could not be expected to consider guidance that did not yet exist when it published its General Plan. Accordingly, we decline to consider the OPR Fire Safety Guidelines in determining substantial compliance

We conclude that the County's general plan is in substantial compliance with the former Government Code section 65302, subdivision (g), requirement to "address evacuation routes" related to "identified fire hazards." Therefore, the County's approval of the Project was not ultra vires.

## II. CEQA

Clean Energy makes several contentions in support of its claim that the County's EIR violates CEQA. We conclude the EIR fails to describe and analyze the wildfire evacuation risk, and reverse for that reason. We reject Clean Energy's other contentions.

### A. General Principles and Standard of Review

"In enacting CEQA, the Legislature declared its intention that all public agencies responsible for regulating activities affecting the environment give prime consideration to preventing environmental damage when carrying out their duties. [Citations.] CEQA is to be interpreted 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112.) The EIR is the "heart of CEQA." (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162 (*Bay-Delta*).) Its purpose is to give the public and government agencies the information about environmental consequences needed to make informed decisions, thus protecting both the environment and informed government. (*Ibid.*; Cal. Code Regs., tit. 14, § 15151.[22])

---

[22] The Guidelines for the Implementation of CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.; hereafter CEQA Guidelines).

39

"An EIR shall identify and focus on the significant environmental effects of the proposed project." (CEQA Guidelines, § 15126.2, subd. (a).) The direct and indirect significant effects of the project on the environment shall be clearly identified and described, and the discussion should include "health and safety problems caused by physical changes in the environment."[23] (*Ibid*.) Also, an EIR "should evaluate any potential significant impacts of locating development in . . . areas susceptible to hazardous conditions (e.g., floodplains, coastlines, *wildfire risk areas*) as identified in authoritative hazard maps, risk assessments or in land use plans addressing such hazard areas." (CEQA Guidelines, § 15126.2, subd. (a), italics added.) "While foreseeing the unforeseeable is not possible, an agency must use its best efforts to find out and disclose

---

[23] In a footnote, Homewood says the County could have ignored the wildfire risk because that risk represents an impact of the environment on the project and its users, not an impact of the project on the environment. Homewood cites *Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455 (*Ballona Wetlands*) in support of this assertion. The court in *Ballona Wetlands* held that the EIR for a mixed-use real estate development need not consider impacts relating to sea level rise as a result of global climate change, because identifying and evaluating the effects on the project and its users of locating the project in a particular environmental setting is neither consistent with CEQA's legislative purpose nor required by the CEQA statutes. (*Id*. at pp. 473-474.) While this case was under submission, respondents sent this court a letter citing new authority in further support of this argument, *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (Sept. 17, 2015, S213478) ___ Cal.4th ___ [2015 LEXIS 9994] (*CBIA*). Homewood forfeited this argument by violating the rule that requires each point be presented in an appellate brief under a separate heading or subheading. (Rule of Court, rule 8.204(a)(1)(B); *Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 201; *In re S.C.* (2006) 138 Cal.App.4th 396, 408; *Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 160 [appellate court may disregard points raised in a footnote rather than properly presented under a discrete heading with appropriate analysis].) Other than the footnote, Homewood devoted the rest of its briefing on the wildfire evacuation issue to its contention that the EIR sufficiently addresses wildfire evacuation risk. Respondents' citation to *CBIA* does not save their argument from forfeiture. In any event, as we discuss *post*, by bringing new operations, development and people into the area, the Project will potentially have a significant effect on the environment related to wildfire.

all that it reasonably can." (CEQA Guidelines, § 15144; *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 726 (*San Joaquin Raptor*).) The EIR's sufficiency is reviewed in light of what is reasonably feasible, and courts look not for perfection but for adequacy, completeness, and a good faith effort at full disclosure. (*Bay-Delta*, *supra*, 43 Cal.4th at p. 1175; CEQA Guidelines, § 15151.)

On review, a court's inquiry is whether the public agency committed a prejudicial abuse of discretion, either by failing to proceed in a manner required by law, or by making conclusions unsupported by substantial evidence. (Pub. Resources Code, § 21168.5; *Bay-Delta*, *supra*, 43 Cal.4th at p. 1161.) The court adjusts its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard*).) If the dispute involves facts or conclusions, the court upholds the agency's findings if supported by substantial evidence. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392-393, 407 (*Laurel Heights I*).)

An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as that of the trial court. We review the agency's action, not the trial court's decision; in that sense our review under CEQA is de novo. (*Bay-Delta*, *supra*, 43 Cal.4th at p. 1162.) We must resolve reasonable doubts in favor of the administrative finding and decision. (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 393.)

### B. Wildfire Evacuation

Clean Energy argues that the failure of the EIR to identify or evaluate "wildfire evacuation risk" in the West Shore violates CEQA. There are two components to the wildfire evacuation risk -- evacuation by residents, workers, and visitors, and the impact of that evacuation on access by emergency entities responding to wildfire. The EIR fails to evaluate both.

The EIR notes that the Project area is considered to be at risk of wildfire from potential ignitions, and it expressly states that "[i]gnition sources of wildfire include natural sources, such as lightning, and *human activities*." (Italics added.) Cal Fire classifies the Project area as a "Very High Fire Hazard Area." Wildfire could be caused by the Project or people associated with the Project and thus, the Project could result in a physical change to the environment caused by such wildfires. Of course, no matter what the cause, there is the risk that such wildfires will necessitate the evacuation of people from the area. And that evacuation could also impact the environment by impeding emergency responders who might otherwise be able to prevent the spread of wildfire.[24]

Clean Energy argues that the failure of the EIR to identify or evaluate the "wildfire evacuation risk" violates CEQA Guidelines section 15126.2, subdivision (a), which as we have noted, requires the lead agency to "clearly identif[y] and describe" the direct and indirect significant effects of the project on the environment and discuss "health and safety problems caused by physical changes in the environment." Clean Energy points out that information relevant to emergency evacuations is not mentioned or analyzed in the EIR, including information about how many vehicles would need to exit the area, whether firefighting equipment access would be impeded by an evacuation of the West Shore, and whether existing roads and bottlenecks such as the Fanny Bridge could accommodate vehicle evacuation.

---

[24] For this additional reason, respondents' citation to *CBIA* does not help their position. Here, the Project presents a risk of causing and/or exacerbating damage to the environment from wildfire. As our high court noted in *CBIA*, CEQA Guidelines, section 15126.2, subdivision (a), calls for an EIR to identify and focus on " 'any significant environmental effects the project might cause *by bringing development and people into the area affected*.' " (*CBIA*, *supra*, 2015 LEXIS 9994, *19.) Thus, "when a proposed project risks exacerbating . . . environmental hazards or conditions that already exist, an agency must analyze the potential impact of such hazards on future residents or users. In those specific instances, it is the *project's* impact on the environment—and not the *environment's* impact on the project—that compels an evaluation of how future residents or users could be affected by exacerbated conditions." (*Id*. at *3.)

42

Clean Energy contends that the EIR's failure to address the impact of this major development on emergency evacuation in the event of a wildfire constitutes a failure to meet the information disclosure requirements of CEQA and therefore a failure to proceed in a manner required by law. Homewood responds that any deficiency in this regard is really just a substantial evidence matter which Clean Energy seeks to convert to a procedural defect in order to benefit from de novo review. We agree with Clean Energy on this point but note substantial evidence review would yield the same result.

Clean Energy stated the following in their comment letter to the draft EIR: "Disaster Preparedness [¶] The EIR should determine whether the project will have an impact on evacuation safety on the West Shore. It *should evaluate the total number of residents, businesses and tourists that can be safely evacuated from the West Shore, without impeding emergency vehicle access, in the event of wildfire*, earthquake or seiche *and evaluate the cumulative impact of the project on natural disaster evacuation and emergency vehicle access to the West Shore. Evacuation of the West Shore is limited [to] two exit routes* in the summer and one during the portions of the winter when SR 89 is closed southbound. Residents of the West Shore are entitled to evacuation that meets National Fire Protection Association [NFPA] Standard 1141.[25]" (Italics added.)

Even if we disregard NFPA Standard 1141 on the ground asserted by Homewood -- that CEQA does not mandate any particular standard -- we still conclude the EIR does not comply with CEQA.

In the context of *routine* traffic congestion, the EIR found the lack of adequate roads to be a significant, unavoidable impact. It inexplicably did not find those same

---

**25** NFPA Standard 1141 calls for the "authority having jurisdiction" (the AHJ) to adopt and maintain a multi-agency operational plan for emergencies, including a "Public Safety and Evacuation Element" (NFPA Standard 1141, § 10.3.5) that includes "[r]outes for evacuations or relocations." (NFPA Standard 1141, § 10.3.5.2.)

inadequate roads to be a significant, unavoidable impact in the context of a wildfire requiring emergency evacuation. Instead, it focused the public safety discussion on emergency vehicle *access*, but even then, it did so without discussing how emergency responders could share those same inadequate roads with vehicles occupied by residents, workers, and visitors evacuating the area.

The Board's CEQA Resolution incorporates a "Table of Impacts, Mitigation Measures, and CEQA Findings," taken from the final EIR. Under the heading of "TRANSPORTATION, PARKING AND CIRCULATION," the table states the following question (TRANS-3): "Will the Project result in a substantial impact upon existing transportation systems, including roadways and intersections?" The answer was yes. It included reference to the "significant congestion at the Tahoe City 'Wye' " in the summertime. It also included recognition of the need for improvements to the Fanny Bridge connection of SR 89 to SR 28, which is already particularly congested in summer months, and that this Project will have a significant impact to this "[s]ummer [q]ueuing" by adding to the congestion. The County found that changes or alterations to the intersection "are within the responsibility of another public agency, Caltrans, which can and should implement improvements to improve existing congestion at the both the Tahoe City Wye and the Fanny Bridge. This impact is considered significant and unavoidable because, although improvements are planned, all of the funding required to implement these improvements has not been identified. Thus, although the Project is required to pay its fair share towards the cost of the improvement, the impact is considered significant and unavoidable."

The EIR stated that other studies, e.g., SR 89 Fanny Bridge Alternatives Traffic Study, have identified improvements to relieve congestion on Fanny Bridge. "Once these improvements are implemented the Project's impact on these intersections will be less than significant. However, funding for the improvement project (particularly state

44

funding) has not been secured, therefore, the impacts are considered significant and unavoidable . . . ."

The County found, "The Fanny Bridge improvement project is identified in the Lake Tahoe Regional Transportation Plan's Project Strategies (Short Term), and is partially funded by two sources[:] the Federal Transportation Improvement Program for the work being done by the Tahoe Transportation District and Placer County Capital Improvement Program traffic impact fees. . . . [F]ollowing publication of the Draft EIR[], the TMPO (Tahoe Metropolitan Planning Organization) and TRPA released the NOP [Notice of Preparation] for the Tahoe Regional Transportation Plan (RTP) and Sustainable Communities Strategy (SCS) Program EIR/EIS on August 24, 2011. The RTP includes a long list of projects from the Tahoe Transportation District's (TTD) Capital Improvement Program. Table 1 in the NOP lists the 'First Phase High Priority' CIP [Capital Improvements Program] Projects. The Fanny Bridge improvement project is identified as a First Phase High Priority project. TTD and Caltrans have determined the Fanny Bridge improvement project will require an EIR/EIS. TTD is the lead agency under CEQA and Caltrans (under delegation authority from FHWA) will be the lead agency under NEPA. The NOP/NOI for the Fanny Bridge improvement project is currently scheduled to be released later this year. Level of service impacts at Fanny Bridge are still considered significant and unavoidable despite [the Resort]'s obligation to pay its fair share fees for the cost of this improvement because the record does not indicate sufficient funding is in place to guarantee construction of the Fanny Bridge improvement project. Construction of these improvements is likely, and the Proposed Project will contribute its share. Because these improvements are not assured, however,

the impact is significant and unavoidable."[26]  The EIR does not cite to any Tahoe City Wye or Fanny Bridge study which considered emergency evacuation from the Project area assuming completion of the Project.  Nowhere in the EIR is there discussion about whether the proposed improvements to the Fanny Bridge will accommodate vehicle traffic in the event of evacuations from the Project area.  The EIR discusses these matters in the context of routine traffic congestion.  Nor is there any discussion about the capacity of SR 89 or connecting roads to accommodate the evacuation of people, with the addition of the people added to the area associated with the Project.

Homewood contends the discussion of two questions under the heading of "Hazard Materials and Public Safety" (PS), PS-1 and PS-2, satisfies CEQA Guidelines section 15126.2, subdivision (a).  We disagree.

"PS-1[.]  Will the Project expose people or structures to a significant risk or loss, injury or death involving fire hazards, including where wild lands are adjacent to urbanized areas or where residents are intermixed with wild lands?

"[Impact:]  Construction and operation of new residential, commercial and recreational facilities in the Project area in a wildland-urban interface (WUI) setting would increase the exposure of people and structures to the risk of wildfires[.]  Wildfires are a substantial threat to the [Resort] Project area and vicinity due to location of people and structures in a WUI setting with heavy fuel loads, steep terrain, summer dry conditions, and multiple ignition sources[.]  Calfire classifies the Project area as a Very High Fire Hazard Area (Calfire 2009a).  [¶]  The Project area, including the NTFPD[27]

[26]  The "Development Agreement" adopted in Ordinance Number 5659-B requires Homewood to pay a Fanny Bridge Construction Fee of $250,000, payable in installments, for the Project's fair share partial funding for the construction of the Fanny Bridge.

[27]  NTFPD is the North Tahoe Fire Protection District.

46

service area, is classified as SRA[28] with Calfire having primary wildland fire suppression responsibility. . . . Alternative 1A includes . . . upgrading the existing snowmaking system to be compatible with wildland fire suppression needs in the Project area[.] [¶] Specific fuel reduction measures, building designs and materials, and snowmaking water delivery systems have not been designed[.] Project compliance with applicable building codes (CBC Chapter 7), road access, and wildland fuel management codes [citation] are not known. Consequently, the increase in exposure of people and structures to wildfire hazards in a WUI setting in the Project area is considered a significant impact[.]

"Mitigation Measure PS-1 NTFPD Design Approval and Annexation [¶] Prior to issuing Building Permits for the Project, Placer County shall require the Project Applicant to pay appropriate fair share development impact fees for Project review and to maintain existing levels of wildland fire protection service and ensure compliance with existing state and local wildland fire protection standards in the NTFPD service area[.] The Project Applicant shall be required to post a bond to ensure that appropriate mitigation measures are completed and in place during construction and implemented for project operation[.] Development impact fees shall be paid at the time the application is submitted to provide for NTFPD, Placer County Fire, and Calfire review and approval of a Fire Suppression and Management Plan for the Project area, including building materials and designs, fire protection systems in buildings, landscaping, fire flows to hydrants and the snowmaking system, emergency vehicle access routes and turnarounds,

---

28 " 'State responsibility areas' " or SRAs are "areas of the state in which the financial responsibility of preventing and suppressing fires has been determined by the board [State Board of Forestry and Fire Protection] pursuant to Section 4125, to be primarily the responsibility of the state." (Pub. Resources Code, § 4102.) An area that is not a SRA may also be designated as a very high fire hazard by the Director of Forestry and Fire Protection under Government Code section 51177, subdivisions (b), (i).

and vegetation treatments in the Project area to ensure compliance with . . . state and local codes.

"Finding  Compliance with Mitigation Measure PS-1 . . . will reduce this impact to a less than significant level, by increase[ing] the level of wildland fire protection capacity available to the Project area to a level equivalent [for] the most current state and local standards . . . and requiring design approvals to ensure that the Project incorporates measure[s] to reduce the risk of exposure of people and structures to wildfires[.]  The Board of Supervisors hereby directs that this mitigation measure be adopted[.]  The Board of Supervisors, therefore, finds that changes or alterations have been required in, or incorporated into, the project that avoid the potentially significant environmental effect as identified in the EIR[.]"  The Board stated as facts supporting the finding, "Implementation of Mitigation Measure PS-1 will increase the level of wildland fire protection capacity available to the Project area to a level equivalent [to] the most current state and local standards for WUI areas.  Design approvals will ensure that the Project incorporates measure[s] to reduce the risk of exposure of people and structures to wildfires to a level of less than significant."

As can be seen, PS-1 said nothing about the impact of the increased population density created by the Project on emergency *evacuations* in the event a wildfire does occur, nothing about the effect of such evacuations on access for emergency responders and suggested no mitigation measures to address any such concerns.  PS-2 purported to do so but only in conclusory statements, unsupported by data or analysis.

"PS-2.  Will the Project result in an interference with emergency response plans or emergency *evacuation* plans?

"[Impact:]  Alternative 1A has the potential to impede emergency responses on a temporary basis during construction, and permanently if adequate emergency vehicle access is not provid[ed] to and throughout the Project area.  Construction would occur in phases, depending on weather conditions, economic factors, and demand for new

48

facilities[.]  Site grading and utility work would occur in the earliest part of construction, followed by the residential and commercial structures[.]  Alternative 1A would follow with construction of the new skier service and related recreational facilities at the North Base area[.]  Construction activities would probably be continuous, except during winter months when some activities would cease due to weather and snow cover[.]  [¶]  Much of the construction work would not affect emergency access to the surrounding area, because construction activities would be primarily focused within the Project area[.]  However, construction vehicles and equipment may block and/or slow through traffic in the surrounding area, especially along SR 89[.]  This could temporarily interfere with the ability of the PCSD[29] or NTFPD to provide emergency services to the Project area and vicinity[.]  A temporary, construction-related impediment to emergency access is considered a significant impact[.]  [¶]  Alternative 1A requires emergency vehicle access and *evacuation* routes to provide for adequate response times and *safe evacuation*.  With major buildings and facilities concentrated next to SR 89, Alternative 1A is expected to have adequate road access and *evacuation* routes, but designs will require access and circulation for emergency response vehicles to multi-story, high-occupancy buildings in the Project area[.]  The potential for inadequate internal circulation and access for emergency vehicles in Alternative 1A results in significant impacts to emergency response[s] or *evacuation* plans[.]"

"Mitigation Measure PS-2  Ensure Emergency *Access* During Construction and Operation  [¶]  The Project Applicant shall prepare and submit an emergency *access* plan to TRPA, Placer County Engineering and Surveying Department (ESD), PCSD, Calfire, and the NTFPD for review and approval before construction permits are issued[.]  The plan shall include detailed *descriptions of how emergency access* would be maintained

---

**29**  PCSD is the Placer County Sheriff's Department.

during Project construction[.]  Emergency access measures are expected to include the following[:]  [¶]  Phasing construction activities to provide continual access to emergency vehicles during construction,  [¶]  Backfilling trenches and/or placing metal plates over the trenches at the end of each workday,  [¶]  Scheduling deliveries and truck trips during off-peak hours,  [¶]  Using or developing alternate access routes as needed, and  [¶] Notifying the PCSD and the NTFPD of construction activities and providing these agencies with a copy of the emergency access plan[.]  [¶]  Prior to issuing Building Permits for the Project, Placer County shall require the Project Applicant to pay appropriate fair share development impact fees for NTFPD review and approval of emergency vehicle access, circulation patterns, and *evacuation routes*.  The Project shall incorporate designs, maintenance measures, and alternative emergency access routes as determined necessary by the NTFPD.  The Project Applicant shall be required to post a bond to ensure that appropriate mitigation measures are completed and in place during construction and implemented for project operation.

"Finding  Compliance with Mitigation Measure PS-2, which has been required or incorporated into the project, will reduce this impact to a less than significant level, *by ensuring that emergency access to the Project area and surrounding areas will not be impeded by Project-related construction activities, and will be provided and maintained during Project operation*.  The Board of Supervisors, therefore, finds that changes or alterations have been required in, or incorporated into, the project that [will] avoid the potentially significant environmental effect as identified in the EIR[.]

"Explanation/Facts in Support of Finding  Implementation of Mitigation Measure PS-2 will ensure that emergency access to the Project area and surrounding areas will not be impeded by Project-related construction activities, and will be provided and maintained during Project operation[.]  This will reduce the risk of interference with emergency response plans or emergency *evacuation* plans to less than significant[.]" (Italics added.)

50

PS-2 is striking in the significant amount of discussion it contains about preventing impediments to emergency access during construction and the lack of information about wildfire evacuation of residents, workers, and visitors, and the impact of that evacuation on emergency responder access. While evacuation and "evacuation routes" are mentioned, there are no facts or analysis regarding evacuations set forth in PS-2.

PS-2 provides that Alternative 1A requires emergency vehicle access and *evacuation* routes to provide for adequate response times and *safe evacuation*. No analysis is provided explaining how this will be accomplished. Homewood relies on the EIR's statement that, "[w]ith major buildings and facilities concentrated next to SR 89, Alternative 1A is *expected to have adequate* road access and *evacuation* routes." This bald assertion addresses the evacuation of buildings along SR 89, but says nothing about the evacuation of people fleeing the "high-occupancy buildings" and in other areas within the Project area to SR 89. More importantly, the assertion states an expectation of the adequacy of access and evacuation routes, including SR 89, without any information upon which to base such an expectation. A claim that there will be adequate road access and evacuation routes cannot be made without a prediction as to the number of vehicles those routes will need to accommodate. Under mitigation, the assurance is made that emergency access into the area will not be impeded by construction activities. But what of the potential impediment to emergency access presented by resident, worker, and visitor vehicles fleeing the Project area and then fleeing the West Shore via SR 89? What of the bottle neck at Fanny Bridge? We recognize that the mitigation section says "[t]he Project shall incorporate designs, maintenance measures, and *alternative emergency access routes* as determined necessary by the NTFPD." But there are two things wrong with Homewood's reliance on this mitigation assertion. First, it speaks only of emergency access routes; it says nothing about the routes upon which vehicles driven by residents, workers, and visitors will be evacuated. Second, and more important, CEQA

51

requires the County to clearly "identify and describe" direct and indirect impacts and also "analyze" the significant environmental effects the project might cause. (CEQA Guidelines, § 15126.2, subd. (a).) It is not sufficient to simply say another agency will fix the problem without knowing the size of the problem; yet, that is essentially what the County has done here. Of course, such a delegation is particularly problematic here where the designated agency, a fire protection agency, has no authority to address the potential lack of roads or road capacity to accommodate vehicles fleeing the area; the fire protection agency cannot order, authorize or fund the construction or modification of roads or bridges if it later determines the existing roads are insufficient.

Homewood also points to an amendment to the mitigation measure labeled "HYDRO-4A" in an attempt to satisfy the CEQA Guidelines section 15126.2, subdivision (a). That measure requires Homewood to "prepare and submit an emergency response and evacuation plan to TRPA, Placer County ESD and the NTFPD for review and approval before construction permits are issued. The plan shall include detailed descriptions of how emergency response and evacuation will occur" in the case of several listed emergency events, including wildfire, which was added as part of the amendment to this mitigation measure. "Additionally, *Project area* emergency access and evacuation designs shall be consistent with NTFPD's Emergency Preparation and Evacuation Guide." (Italics added and underscore omitted.) As with the mitigation referenced in PS-2, there is a failure to identify, describe and analyze the resident, worker and visitor evacuation as well as the potential for such evacuations to impede emergency access. Consequently, this amendment does not satisfy the CEQA Guidelines section 15126.2, subdivision (a), requirement to analyze significant environmental effects caused by the risk of having to evacuate people in the event of wildfire. The EIR simply provides this mitigation measure in an information vacuum, and essentially leaves it up to Homewood to fill in the blanks later. Moreover, it appears that Homewood is simply tasked in this mitigation measure with creating a response and evacuation plan based on existing roads

52

and bridges, which given the lack of capacity to handle routine traffic, must also lack the capacity to accommodate a mass evacuation by large numbers of vehicles. The County cannot use this mitigation measure as a substitute for analyzing the potentially significant impact related to evacuation of residents, workers, and visitors fleeing wildfire and the impact of that evacuation on access for emergency responders.[30]

In summary, the EIR largely focuses on fire *prevention*, *suppression*, and *access* for emergency responders, and it says nothing substantive about emergency *evacuations* of residents, workers and visitors or the impact of such evacuations on access for emergency personnel, vehicles, and equipment. What it does say about the wildfire evacuation risk is conclusory and insufficient to satisfy the requirement to identify, describe and analyze resident, worker and visitor evacuation as well as the potential for such evacuations to impede emergency access. Bare conclusions, even if true, are insufficient to fulfill the informational purpose of an EIR. (*Kings County*, *supra*, 221 Cal.App.4th at p. 736.) " 'The EIR must contain facts and analysis, not just the bare conclusions of a public agency. An agency's opinion concerning matters within its expertise is of obvious value, but the public and decision-makers, for whom the EIR is prepared, should also have before them the basis for that opinion so as to enable them to

---

[30] Homewood also cites testimony from people associated with various fire related agencies at the County hearings. While these people testified that the Project improves various aspects of fire safety in the area, counsel for Homewood acknowledged at oral argument that none of them discussed evacuation of residents, workers, and visitors from the area or the impact that evacuation would have on their response to a wildfire. In any event, testimony in the administrative record is not a substitute for the facts and analysis that must be included in the EIR. While the County will have the information provided in that testimony, members of the public who do not attend will not. Thus, the testimony hardly fulfills the EIR's statutory goal of informing the public or fostering informed public participation. The EIR must contain detail sufficient to enable those who did not participate in its preparation, including members of the public who do not attend the public hearings, to understand and meaningfully consider the issues raised by the proposed project. (See *Laurel Heights I*, *supra*, 47 Cal.3d at p. 405.)

53

make an independent, reasoned judgment.' [Citation.]" (*Ibid*.) The failure to provide information required by CEQA in an EIR is a failure to proceed in a manner required by law. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 118.) County decision makers and the public were deprived of information necessary to make a meaningful assessment of the impact of wildfire evacuation and the impact of wildfire evacuation on emergency access; therefore, the failure to comply with this CEQA informational requirement is a failure to proceed as required by law and an abuse of discretion. (*Ibid*.)

Furthermore, we must conclude that any suggestion that mitigation measures in the EIR will somehow reduce wildfire evacuation risks is not supported by substantial evidence in light of the failure to develop and evaluate the information upon which such a finding could be validly based. "[S]ubstantial evidence" under CEQA "includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (Pub. Resources Code, § 21080, subd. (e)(1); CEQA Guidelines, § 15384, subds. (a), (b).) Substantial evidence is not "unsubstantiated opinion or narrative." (Pub. Resources Code, § 21080, subd. (e)(2); CEQA Guidelines, § 15384, subd. (a).)

The County made fact-based findings that the Project will have a significant, unavoidable, adverse impact on *routine* traffic congestion and acknowledged that bridge and road expansion to mitigate routine traffic congestion is uncertain. But then the County relied solely on its unsubstantiated opinion and conclusory references to wildfire evacuation to satisfy its obligation under CEQA to identify, describe, and analyze the wildfire evacuation risk associated with residents, workers, and visitors fleeing the area and the impact that evacuation will have on emergency response access. Reversal of the approval of the EIR is required on this basis.

### C. Energy Impacts

Clean Energy argues the EIR failed to consider energy impacts in four respects: (1) energy impacts of increased snowmaking; (2) energy conservation; (3) transportation

and equipment energy impacts; and (4) renewable energy resources. Clean Energy has failed to establish that any of these arguments are grounds for reversal.

### 1. Energy Impacts of Increased Snowmaking

Clean Energy contends that the EIR should have provided a detailed estimate of energy needed for the expanded snowmaking and addressed the energy efficiency of the system. Homewood points out that the system is yet to be designed, so the EIR analyzed expanded snowmaking only at a programmatic level and subsequent environmental review will be required prior to development. We agree with Homewood that it is not inappropriate to address the expanded snowmaking system in a second tier EIR when it is ripe for review.

Under a section in the County's resolution entitled, "Combined Program and Project-Level Analysis," the County explained that the EIR "provides a program-level analysis of the construction of facilities that are part of the proposed Project, but for which specific plans and designs have not yet been prepared." It then lists six such projects for which plans and designs will be deferred. Among these projects is "Snowmaking Expansion including Accessory Buildings (e.g., pump houses)."[31] The County goes on to explain that while the EIR "identifies [] all the plans and facilities that would be included in the proposed project, it does not provide project-specific analysis of those that are analyzed at the programmatic level." Consistent with this, the County's use permit states that the proposed snowmaking expansion was "analyzed at a programmatic level and will require subsequent environmental review prior to development."

---

[31] The other projects are: Extension of Cross-Country Ski Trails at South Base Area; Mid-mountain Learn to Ski Lift and Ellis Chair Lift Replacement; On Mountain Road Abandonment and Restoration (e.g., restoration sites with potential use of project generated fill materials); South Base Tahoe Ski Bowl Way Extension to North Base Townhouses; and North Base Townhouses.

The EIR does include discussion about the expanded snowmaking system, which will expand snowmaking from 23.8 acres to 102.3 acres. For example, there is a great deal of discussion about water and water sources. Water sources were identified for the projected water demand increase from 14.2 million gallons per year to 60.8 million gallons per year. The system will require additional water supply, distribution pipelines, electrical supply, transmission lines, and equipment. Water pumping capacity of 3,145 horsepower will generate 3,400 gallons per minute flow rate. The water pipeline and electrical power alignments will generally follow existing onsite roadways or ski trails. The expanded snowmaking will not only contribute to profitability of the Project, it will also be used for fire suppression in the Project area and is mentioned in Mitigation Measure PS-1 as one of the strategies that will increase the level of wildfire protection.

Nevertheless, the expanded snowmaking system had not yet been engineered, and no specific plans or designs had been prepared for snowmaking expansion.[32] Homewood

---

[32] Clean Energy claims the expanded snowmaking system has been designed and that design is included in the Project master plan. However, in making this claim, Clean Energy cites to testimony given at an October 18, 2011, planning commission hearing, where Art Chapman, a representative of Homewood, testified about the master plan for the Project. During that testimony, he talked about how a snowmaking system, at a resort in Montana owned by Homewood's owners, was deployed to help suppress a wildfire that saved the resort and nearby town. Chapman said, "We are proposing to do the same thing here." Clean Energy apparently reads this testimony to mean Homewood intends to install the same system used in Montana in this project, but we do not read it that way. We read the testimony only as indicating the intent to install a snowmaking system that can be used for fire suppression. The record here is clear, however, that the system for Homewood has not yet been engineered.

In the trial court, Clean Energy made a similar claim. However, at that time it asserted a report from a consultant demonstrated that the specifics of the snowmaking system were already known. The report contained a good deal of information, particularly about water needs, pumping, and piping. However, the consultant's report expressly states, "The snow making master plan will require more detailed final engineering for the pumping stations and buildings, water cooling towers, primary and secondary electrical supply and distribution and snow gun layouts." Also, a review of that report reveals there

plans to study energy efficiency and conservation related to snowmaking expansion. The EIR states, "Several small accessory buildings will be associated with snowmaking operations (e.g., new/updated pump houses) and alternative energy generation. Opportunities for providing alternative energy sources will be explored during development of the Project. Plans include exploration of renewable energy sources such as micro-hydro, solar, geothermal, biomass, and wind energy for serving the Project area. The most promising possibility for energy generation lies in a potential micro-hydro development on Madden Creek and the Quail Lake outlet stream. These proposals, once developed in more detail, will require additional environmental analysis and permit review in the future." Consistent with the discussion in the EIR, the County has not approved the expansion of snowmaking. Instead, the County has committed to review the expanded snowmaking system as a second tier project EIR.

As noted, Clean Energy argues that it is inappropriate to address the energy issues related to the expanded snowmaking system in a project EIR to be prepared in the future. We disagree.

A program EIR is "an EIR which may be prepared on a series of actions that can be characterized as one large project" and are related in specified ways. (CEQA Guidelines, § 15168, subd. (a).) As our high court has noted, "a *program* EIR is distinct from a *project* EIR, which is prepared for a specific project and must examine in detail site-specific considerations." (*Bay-Delta*, *supra*, 43 Cal.4th at p. 1169, citing CEQA Guidelines, § 15161.) "Program EIR's are commonly used in conjunction with the process of tiering. [Citation.] . . . Tiering is proper 'when it helps a public agency to focus upon the issues *ripe* for decision at each level of environmental review . . . .' [Citations.]" (*Bay-Delta*, at p. 1170, italics added.) "Where a lead agency is using the

_____

is no discussion about the proposed firefighting feature for the expanded snowmaking project. The consultant's report appears to be preliminary in nature.

tiering process in connection with an EIR for a large-scale planning approval, . . . detailed, site-specific information may not be feasible but can be deferred . . . until such time as the lead agency prepares a future environmental document in connection with a project of a more limited geographic scale, as long as deferral does not prevent adequate identification of significant effects of the planning approval at hand." (CEQA Guidelines, § 15152, subd. (c); *Bay-Delta*, at p. 1170.)

In deciding *Bay-Delta*, our high court found the analysis in *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729 (*Al Larson*) to be instructive. The *Bay-Delta* court noted, "At issue in *Al Larson* was the propriety of deferring analysis to future project EIR's for a city's port development plan. [Citation.] The plan proposed the use of six anticipated projects to develop the port to meet increased demand for commercial cargo handling. [Citation.] The Long Beach Board of Harbor Commissioners chose, however, to defer approval on specific sites for those six projects to second tier project EIR's, two of which were considered nearly concurrently with the final first-tier EIR. [Citation.] . . . 'The concept of tiering supports allowing *the agency and the public to first decide whether it is a good idea* to increase Port capacity in a given five-year period at all . . . . If that decision is made in the affirmative then each individual project can be reviewed in-depth on its merits in a project EIR . . . .' [Citation.]" (*Bay-Delta*, *supra*, 43 Cal.4th at p. 1176, italics added.) The *Bay-Delta* court went on to note that "[i]n *Al Larson*, the board had committed itself to ' "conduct individual environmental assessments in accordance with CEQA on a project-by-project basis for each of the indicated projects." ' [Citation.]" (*Ibid.*)

We believe *Al Larson* is instructive here, as well. Like in *Al Larson*, tiering allowed the County and the public to first decide whether the Project, "is a good idea." And the County, similar to the lead agency in *Al Larson*, has committed itself to conduct the environmental assessments required by CEQA on the expanded snowmaking system. Since the EIR here does not include discussion about the energy usage and efficiency of

58

the snowmaking system, a second tier EIR done after the system has been engineered must include discussion on those energy-related matters.

This court recently applied the principals in *Bay-Delta* and *Al Larson* in considering whether a program EIR for the proposed high-speed rail system improperly deferred discussion about the impacts of elevated vertical alignment[33] for the system through a portion of the San Francisco Peninsula. (*Town of Atherton v. California High-Speed Rail Authority* (2014) 228 Cal.App.4th 314, 341-343 (*Town of Atherton*).) There was a public comment expressing concern that the system would require aerial viaducts or raised berms, and that elevated trains posed problems to residential neighborhoods. (*Id*. at p. 342) The High-Speed Rail Authority responded that the need for such a system would be evaluated and refined as part of the later project-level preliminary engineering and environmental review. (*Ibid*.) Subsequently, before the program EIR was certified, the High-Speed Rail Authority determined an elevated structure, or aerial viaduct, was the only feasible alignment through a portion of the route. The petitioners contended that elevated alignment was a foreseeable part of the system and should have been discussed in the program EIR, not deferred to project-level analysis. (*Id*. at p. 343.) This court concluded the EIR properly deferred detailed analysis of the impacts of the vertical alignment to the second tier EIR, noting that the precise vertical alignment at specific locations is the type of site specific consideration that must be examined in a project EIR. (*Id*. at p. 346.) We noted the purpose of tiering is " 'to focus upon the issues *ripe* for decision at each level of environmental review' " and reasoned that postponing the analysis of the aerial viaducts "was appropriate under tiering, just as was delaying approval of the six individual projects in *Al Larson*." (*Ibid*., italics added.) The same analysis applies in the instant case.

---

[33] The term "alignment" means where to lay the track. (*Town of Atherton*, *supra*, 228 Cal.App.4th at p. 322.)

Here, information about the energy usage and efficiency of the snowmaking system is not ripe for consideration because the expanded system for Homewood has yet to be engineered and designed. Consequently, the provision of specific information related to these energy issues is not yet feasible. If Clean Energy is suggesting that Homewood must necessarily settle now on snowmaking engineering with known energy needs and specific proposed efficiency and conservation strategies before obtaining certification of the EIR here, we disagree. We see nothing in CEQA that requires such an investment before the lead agency makes a decision on whether the program should go forward. To the contrary, CEQA encourages tiering. Public Resources Code section 21093, subdivision (a), states the legislative finding that tiering of EIRs promotes construction of development projects and sets forth several purposes of tiering, including the legislative finding that "tiering is appropriate when it helps a public agency to focus upon the issues *ripe for decision* at each level of environmental review . . . ." (Italics added.) Subdivision (b) of section 21093 states that EIRs "shall be tiered whenever feasible, as determined by the lead agency." CEQA Guidelines section 15152, subdivision (b), states that "[a]gencies are encouraged to tier the environmental analyses which they prepare for separate but related projects including . . . development projects."

While energy-related issues must ultimately be addressed in a second tier project EIR, we conclude the discussion about the proposed snowmaking expansion in the current EIR does not violate CEQA.

## 2. Energy Conservation

As we discuss in more detail *post*, the energy consumption numbers in the EIR indicate the Project will increase electrical usage approximately 3,150 percent. Based on this, Clean Energy contends the energy analysis EIR failed to consider whether the Project would result in the inefficient, wasteful, or unnecessary consumption of energy.

CEQA Guidelines section 15387, appendix F (Appendix F), section I, states: "The goal of conserving energy implies the wise and efficient use of energy. The means of

achieving this goal include: [¶] (1) decreasing overall per capita energy consumption, [¶] (2) decreasing reliance on fossil fuels such as coal, natural gas and oil, and [¶] (3) increasing reliance on renewable energy sources. [¶] In order to assure that energy implications are considered in project decisions, [CEQA] *requires that EIRs include a discussion of the potential energy impacts of proposed projects, with particular emphasis on avoiding or reducing inefficient, wasteful and unnecessary consumption of energy* (see Public Resources Code section 21100(b)(3)).”**34** (Italics added.) “[A]n EIR is 'fatally defective' when it fails 'to include a detailed statement setting forth the mitigation measures proposed to reduce wasteful, inefficient, and unnecessary consumption of energy.' [Citation.]” (*California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173, 209 (*City of Woodland*).) As this court has previously observed, despite Appendix F, “lead agencies have not consistently included such analysis in their EIRs. (Cal. Natural Resources Agency, Final Statement of Reason for Regulatory Action: Amendments to the State CEQA Guidelines Addressing Analysis and Mitigation of Greenhouse Gas Emissions Pursuant to SB97 (Dec. 2009) p. 71.) For this reason, California's Natural Resources Agency amended Appendix F to the CEQA Guidelines in 2009 'to ensure that lead agencies comply with the substantive directive in section 21100(b)(3)' [Citation.]” (*City of Woodland*, at p. 209.) However, while energy conservation measures shall be discussed when relevant (CEQA Guidelines, § 15126.4, subd. (a)(1)(C)), neither Appendix F, nor any other CEQA provision requires the EIR to discuss every possible impact or conservation measure referenced in Appendix F. (*Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 935 (*Tracy First*).)

---

**34** Public Resources Code section 21100, subdivision (b)(3), provides: “(b) The [EIR] shall include a detailed statement setting forth . . . : (3) Mitigation measures proposed to minimize significant effects on the environment, *including,* but not limited to, *measures to reduce the wasteful, inefficient, and unnecessary consumption of energy*.” (Italics added.)

Appendix F states that the EIR discussion of the environmental setting "may include existing energy supplies and energy use patterns in the region and locality." (CEQA Guidelines, appen. F, § II, subd. B.) Environmental impacts "may include: [¶] 1. The project's energy requirements and its energy use efficiencies by amount and fuel type for each stage of the project including construction, operation, maintenance and/or removal. If appropriate, the energy intensiveness of materials maybe discussed. [¶] 2. The effects of the project on local and regional energy supplies and on, requirements for additional capacity. [¶] 3. The effects of the project on peak and base period demands for electricity and other forms of energy. [¶] 4. The degree to which the project complies with existing energy standards. [¶] 5. The effects of the project on energy resources. [¶] 6. The project's projected transportation energy use requirements and its overall use of efficient transportation alternatives." (CEQA Guidelines, appen., F, § II, subd. C.) Mitigation measures "may include: 1. Potential measures to reduce wasteful, inefficient and unnecessary consumption of energy during construction, operation, maintenance and/or removal. The discussion should explain why certain measures were incorporated in the project and why other measures were dismissed. [¶] 2. The potential of siting, orientation, and design to minimize energy consumption, including transportation energy, increase water conservation and reduce solid-waste. [¶] 3. The potential for reducing peak energy demand. [¶] 4. Alternate fuels (particularly renewable ones) or energy systems. [¶] 5. Energy conservation which could result from recycling efforts." (CEQA Guidelines, appen. F, § II, subd. D.)

The EIR discussed mitigation measures proposed to reduce the wasteful, inefficient, and unnecessary consumption of energy. It stated that all Homewood facilities will comply with title 24 of the California Code of Regulations (Title 24).[35]

---

[35] Homewood argues here, as it did in the trial court, that the EIR would *decrease per capita consumption* by requiring all facilities to comply with Title 24. However, the EIR

62

While Title 24 is the entire California Building Code, the reference to Title 24 in this context is understood to relate to the efficiency standards in part 6 of Title 24. Homewood relies on *Tracy First*, *supra*, 177 Cal.App.4th at pages 933-934, for the proposition that the County had discretion to cite compliance with Title 24 to support its conclusion that the Project will not result in wasteful energy consumption. In *Tracy First*, the EIR stated the project would be 25 percent more efficient than required by the California Building Energy Efficiency Standards in part 6 of Title 24. (*Tracy First*, at pp. 932-933.) This court rejected an argument that reliance on state standards was improper. (*Id*. at pp. 933-934.) The commitment to Title 24 is appropriate and consistent with Appendix F, section II, subdivision C.4., which lists as an impact, "The degree to which the project complies with existing energy standards." However, unlike in *Tracy First*, where the project was a grocery store, the project here has multiple components, some of which may not be considered "buildings" (e.g., ski lifts) and thus not within the scope of Title 24, part 6. The Building Code "does not extend beyond the buildings themselves." (*City of Woodland*, *supra*, 225 Cal.App.4th at p. 211.) Moreover, like the shopping center in *City of Woodland*, the requirement that the Project here comply with Title 24 "does not, *by itself*, constitute an adequate assessment of mitigation measures that can be taken to address the energy impacts." (*City of Woodland*, at p. 211.) But the County does not rely solely on Title 24 compliance. There are other measures to which the EIR commits the Project which "reduce wasteful, inefficient and unnecessary consumption of energy" consistent with Appendix F.

The EIR makes reference in the "Public Services and Utilities" section to using renewable energy to augment electrical demand, thereby decreasing reliance on fossil fuels. It also says the buildings will have high efficiency insulation, windows, appliances

makes no reference to "decrease per capita energy consumption" in connection with the application of Title 24 standards.

63

and building materials.  In the "Climate Change" section, the EIR states that the Project will use solar heating for pools and spas and install solar or wind power systems and solar hot water heaters.  It also says it will educate consumers (presumably homeowners) about existing incentives.  These commitments are consistent with the Appendix F goals of decreasing reliance on fossil fuels such as coal, natural gas and oil, and increasing reliance on renewable energy sources set forth in Appendix F, section I (2) and (3).

The EIR also commits the North Base and South Base areas of the Project to Leadership in Energy and Environmental Design (LEED) standards.  In the "Proposed Project and Alternatives" section, the EIR states, "The North Base area has been accepted into and will be designed under the [LEED] for Neighborhood Development Pilot Program as an example of exemplary green and sustainable development.  The South Base area, although not appropriate for the LEED for Neighborhood Pilot Program because it is not a mixed use development, will be designed to achieve sustainable development goals using the LEED criteria as a template."  In the "Public Services and Utilities" section, the EIR states that the LEED certification for the North Base will require a 50 percent decrease in energy use per guest compared to standard construction and operation of similar facilities.  In various other sections of the EIR, the Project commits to reductions of energy based on the LEED Rating System.  In the "Climate Change" section, the EIR states that the Project "will demonstrate a 20% reduction in building performance compared to baseline or comply with ENERGY STAR ratings (USGBC 2007)."  And the Project will develop on-site energy generation systems "with peak electrical generating capacity of at least 5% of the Project's specified electrical service load (USGBC 2007)."  "[T]he Project will achieve a 15% annual energy reduction beyond an estimated baseline energy use for infrastructure (USGBC 2007)."  All of these commitments are examples of the Appendix F impact, "[t]he degree to which the project complies with existing energy standards."  (CEQA Guidelines, appen. F, § II, subd. C.4.)  The 50 percent decrease in energy per guest compared to standard

64

construction and operation of similar facilities speaks to the goal of decreasing overall per capita energy consumption in Appendix F, section I (1).

The EIR, in the "Proposed Project and Alternatives" section, says the Project plans to implement "green building principles." The principles pertinent to energy efficiency stated in the EIR are as follows:

"Building Orientation - The proper positioning or orientation of the buildings to play a significant role in how much energy is expended throughout the year." This is in line with the mitigation measure in Appendix F, section II, subdivision D.2., the potential of siting and orientation.

"Building Energy Efficiency - The buildings in the Project area will be well-insulated with tight construction and the use of non-toxic and/or recycled insulation materials and plans will include exploring ways to recapture waste heat from boilers for uses such as radiant heat systems, domestic hot water, laundry needs, pools, hot tubs and other places that require heat." "Building Materials - The materials from the de-constructed buildings will be recycled and reused in new buildings and the components from old chair lifts can potentially be reused at [the Resort] and at other ski resorts." These items are consistent with the mitigation measure in Appendix F, section II, subdivision D.5., "Energy conservation which could result from recycling efforts."

"Building Electrical Systems - For spaces that require artificial lighting, high efficiency lighting that utilizes fluorescent and LED fixtures will lower energy costs." Again, this is consistent with Appendix F, section II, subdivision D.1., "[p]otential measures to reduce wasteful, inefficient and unnecessary consumption of energy during . . . operation."

Although the EIR does not expressly state the Project will not result in the wasteful, inefficient, and unnecessary consumption of energy, the EIR discussion we have referenced satisfies Appendix F in that it provides an array of measures to achieve that central goal.

Despite this discussion, Clean Energy argues that the County's energy consumption analysis was insufficient. Clean Energy argues the EIR "simply concluded" that the impact of the Project's energy needs on the public utility company, NV Energy[36] would not strain the public utility's capabilities and would be " 'minor in relation to the total amount of energy supplied by NV Energy in its service area.' "[37] As Clean Energy points out, simply concluding there is adequate supply says nothing about whether the energy will be used efficiently. However, as we have noted, the EIR discussion on energy consumption does not stop there. Moreover, the statement relating the impact on the energy supply company was proper. Appendix F, section II, subdivision C.2. lists as an impact that may be considered, "The effects of the project on local and regional energy supplies and on requirements for additional capacity."

Clean Energy's main contention is that the EIR showed a 3,150 percent increase in energy consumption over the current resort's use. Homewood maintains, as it did in the trial court, that the real increase is only half of the stated 3,150 percent, and the 3,150 percent figure was a result of a mathematical error in a report on energy use prepared by consultant Beaudin Ganze Consulting Engineers, Inc. That report, though not a part of the EIR, is repeatedly referenced in the EIR. Citing the Beaudin Ganze report, the EIR stated the existing electricity consumption is 1,372,000 kilowatt-hours per year (kWh/year), and the Project will increase it by 43,221,658 kWh/year, for a total usage of over 44.5 million kWh/year. The Beaudin Ganze report stated current usage as 1,220,000 kWh/year and estimates the Project will add a total of 43,374,000 kWh/year.[38] However,

---

[36] There is some indication in the record that NV Energy is now Liberty Energy, but we use the term used in the EIR.

[37] The EIR also said the additional load would require upgrade of the Tahoe City substation which supplies electricity to the Project area.

[38] The Beaudin Ganze report attributed "most of this usage to ski lift operation[s]."

this total is not an accurate mathematical total of the Beaudin Ganze report's estimated use for the three project areas (14,417,000 for North Base, 6,528,000 for South Base, and 741,000 for Mid-mountain). The three numbers add up to 21,686,000. Although Clean Energy's representative commented at the hearing on the final EIR that "the energy consumption of the project is increasing by approximately 3,000 percent" and further stated, "It's a huge increase on energy consumption," apparently nobody noticed this mathematical error until this litigation commenced. Despite this mistake, we discern no prejudice.

In *Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184 (*Mount Shasta Bioregional*), this court discussed prejudice in the context of CEQA. The draft EIR contained an understatement of water usage for the proposed project. It stated the project would use a total of 120,000 gallons per day (gpd), which was within the historic range. (*Id.* at p. 191.) However, a consultant had opined the project would use 230,400 gpd. On appeal, the defendants did not attempt to refute the discrepancy; instead they argued the error was not prejudicial. (*Id*. at p. 226.) This court observed, "It is not enough simply that the EIR misstated an aspect of a proposed project. 'Noncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown. [Citation.] . . . "[A] prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." ' [Citation.] The fact the overall water usage on the Project may have been understated in the DEIR would not appear to preclude informed decisionmaking or informed public participation unless the increased usage would have a significant environmental impact. We will not presume that to be the case here. [Citation.]" (*Ibid*.)

On appeal, Clean Energy argues that the 3,150 percent increase suggests extremely inefficient energy usage on the face of the EIR and leads to the "inevitable conclusion" that energy efficiency was "never seriously considered," because nobody

67

questioned this estimate. Clean Energy makes no other prejudice argument. Given the energy conservation strategies we have noted in the EIR, we cannot say that the overstatement showed that energy efficiency was not seriously considered. Instead, we conclude the overstatement of electrical consumption was not prejudicial.

Failure to notice the overstatement is understandable given the expansive nature of the Project. The Project transforms the resort in significant ways and an increase was to be expected. The resort does not currently offer overnight accommodations. Consequently, the current resort is a " 'day ski' " resort, attracting mostly people who drive into the area for a day of skiing. The Project converts the resort from one catering to day skiers to a larger resort attracting overnight guests. The current resort has limited dining facilities. New food and beverage facilities will be added. Employee workforce housing will also be constructed. The ski facilities will be modernized and capacity increased. Lift capacity will be increased from 8,646 to 9,797 people per hour, including a new beginner lift. Commercial space and residential units will be constructed. Because these significant changes would likely increase energy consumption, it is not hard to see how the decision makers and the public (including Clean Energy) simply overlooked the mathematical mistake in the energy consumption computation. The failure to detect the real percentage increase over the current resort usage was simply a mistake. However, in our view, this mistake did not preclude informed decision making and informed public participation or otherwise thwart the statutory goals of the EIR process. (*Mount Shasta Bioregional*, *supra*, 210 Cal.App.4th at p. 226.)

In the trial court, Clean Energy argued that a more thorough energy analysis would have isolated the reason for the 3,150 percent increase. But if that is true, nothing would have changed. The mathematical error would have been discovered, and the decision makers would have learned the real increase was a 1,575 percent increase, but we see nothing to suggest this would have changed the County's approval of the EIR.

68

On appeal, Clean Energy calls the overstatement a lack of substantial evidence, citing *Vineyard*, *supra*, 40 Cal.4th 412.  It argues that if the data on energy consumption is off by a factor of two, that data is clearly erroneous and cannot constitute substantial evidence supporting the analysis of energy conservation.  In support of this contention, Clean Energy cites the following quote from *Vineyard*: "Factual inconsistencies and lack of clarity in the []EIR leave the reader—and decision makers—without substantial evidence." (*Id*. at p. 439.)  But the quote is taken out of context, and the context distinguishes *Vineyard* from the instant case.

The substantial evidence issue addressed in *Vineyard* related to the EIR's analysis about water supply sources.  The EIR had deferred a determination of water sources for a large, mixed-use development project.  (*Vineyard*, *supra*, 40 Cal.4th at pp. 421, 428.) The excerpt of *Vineyard* Clean Energy relies upon can be found in the following more complete quote:  "Plaintiffs are correct . . . that the FEIR's discussion of the *total* long-term water supply and demand in the [project area] leaves too great a degree of uncertainty regarding the long-term availability of water for this project.  *Factual inconsistencies and lack of clarity in the FEIR leave the reader—and the decision makers—without substantial evidence* for concluding that sufficient water is, in fact, likely to be available for the [] project at full build-out." (*Id*. at p. 439, second italics added.)  Here, in contrast, there is no dispute that there are sufficient sources of electrical energy to supply the Project.

Lastly, Clean Energy complains that Homewood has constructed an energy conservation analysis from information "scattered" throughout the EIR.  Characterizing the fact that information pertinent to energy conservation is found in multiple chapters of the EIR as a "strategy," Clean Energy states that unconnected references to energy in various sections of the EIR is not an "analysis presented in a manner calculated to adequately inform the public and decision makers."  Again, Clean Energy snips an excerpt out of *Vineyard* to support its contention.  The full quote from *Vineyard* reads:

69

"The data in an EIR must not only be sufficient in quantity, it must be presented in a manner calculated to adequately inform the public and decision makers, who may not be previously familiar with the details of the project. '[I]nformation "scattered here and there in EIR appendices" or a report "buried in an appendix," is not a substitute for "a good faith reasoned analysis." ' " (*Vineyard*, *supra*, 40 Cal.4th at p. 442.) This description does not fit the EIR here. The energy related information was not scattered in appendices. Rather, energy related information, including the Baudin Ganze report, is discussed in the EIR under topics where energy issues are implicated. While a separate section summarizing information germane to Appendix F would be helpful (see *Tracy First*, *supra*, 177 Cal.App.4th at pp. 930-931 [noting that the EIR in that case discussed energy issues in a separate section]), such a section would have been repetitive of information appropriately discussed elsewhere in the EIR. The EIR here served the purpose of informing the public and decision makers about energy conservation issues pertinent to the Project. Clean Energy does not identify a requirement that energy conservation related issues be discussed in a separate section in the EIR, and we are aware of none. And we must interpret CEQA in a manner that does not impose substantive or procedural obligations beyond those set forth in statute and the guidelines. (Pub. Resources Code, § 21083.1; *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1107 [Noting that the legislative history of Public Resources Code section 21083.1 was to limit judicial expansion of CEQA requirements and reduce uncertainty and litigation risks for local governments and project applicants by providing a " 'safe harbor' " to local entities and developers who comply with the express requirements CEQA.].)

We conclude the EIR's treatment of energy conservation complies with the CEQA requirement to "include a discussion of the potential energy impacts of proposed projects, with particular emphasis on avoiding or reducing inefficient, wasteful and unnecessary consumption of energy." (CEQA Guidelines, § 15387, appen. F, § I.)

70

### 3. Transportation and Equipment Energy Impacts

Clean Energy argues the EIR failed to evaluate transportation and equipment energy impacts. Clean Energy points out that the Project will increase vehicle miles traveled (VMT) in the Tahoe Basin by 8,431 daily, adding 1,466 new trips daily during the summer season, and increasing on-site diesel storage from 3,000 gallons to 40,000 gallons.

Homewood argues these claims are barred for failure to exhaust administrative remedies because these points were not raised during the administrative process. (Pub. Resources Code, § 21177, subd. (a).) Homewood also argues the EIR *did* consider these impacts. We agree that Clean Energy failed to exhaust administrative remedies on this issue when it did not call it to the attention of the County during the public comment process.

This court discussed the rules concerning exhaustion of administrative remedies in *Tracy First*. "A party cannot maintain an action alleging that the EIR does not comply with the environmental quality division of the Public Resources Code '*unless the alleged grounds for noncompliance* with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination.' " (*Tracy First*, *supra*, 177 Cal.App.4th at p. 930, citing Pub. Resources Code, § 21177, subd. (a), italics added.) " ' "[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them." [Citation.]' [Citation.] [¶] 'The petitioner bears the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level. [Citation.]' [Citation.]" (*Tracy First*, at p. 926.) "Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action." (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1199.)

71

Clean Energy expressed no concerns about transportation and equipment energy impacts in their comment letter regarding the DEIR or in their oral comments at the administrative appeal hearing. Nor has Clean Energy pointed to comments made by anyone else who expressed these concerns.

Clean Energy failed to exhaust administrative remedies related to their belated complaint that the EIR failed to evaluate transportation and equipment impacts.

### 4. Renewable Energy Resources

Clean Energy argues the EIR failed to discuss the renewables content of the electricity supply or the renewable resources available to the Project. Homewood argues this contention is also barred by failure to exhaust administrative remedies. We agree with Homewood on this point. These matters were not mentioned in Clean Energy's comment letter or during the presentation by Clean Energy's representative at the administrative appeal hearing, and Clean Energy points to no other commentators who expressed the renewable energy concerns it belatedly raises in its appellate briefing.

### D. World-Wide Tourism Impacts

Clean Energy argues the EIR failed to consider long-distance travel/tourism impacts related to world travelers. Again, Homewood contends Clean Energy failed to exhaust administrative remedies, and we again agree with Homewood.

Clean Energy's comment letter on the draft EIR stated: "Increased Tourism [¶] Implementation of the project will increase tourism in the Lake Tahoe Basin. Thousands of people already drive from distant locations to visit the slopes of Lake Tahoe for down-hill skiing and other recreational activities. The EIR must evaluate the environmental impacts caused by the increased long-distance travel to the Tahoe basin resulting from increased tourism." Nothing more was said about increased tourism, and Clean Energy did not mention what it meant by "long-distance" in its comment letter. Among the numerous appendices attached to the comment letter were a report and a research paper

72

discussing impacts of travel to ski areas, but Clean Energy did not refer to these submissions in its comment letter.

The EIR said the Project will increase tourism in the Tahoe Basin. On the question of long-distance travel, the EIR analyzed traffic impacts at intersections most likely to be affected by Project traffic. The EIR contained a "level of service" analysis examining the operating performance of intersections or roadways up to six miles from the Project. The EIR concluded that, after that distance, impacts would become negligible as traffic disperses as it travels further from the Project. The EIR analyzed project trip distribution based on travel patterns in the area, seasonal variations in trip distribution patterns, VMT based on daily trip generation results for the Project, and average trip length numbers.

At the administrative hearing, Clean Energy's representative focused travel issues on greenhouse gas emissions and local traffic impacts. He said nothing about people travelling to Tahoe from other places on the planet. Clean Energy's representative said, "[T]ourist travel has not been factored into the greenhouse gas or energy computations. We think the tourist emissions are important. We don't agree that this is going to reduce traffic on the West Shore. The traffic impact has not been carefully calculated. It's based on assumptions. They're not going to put in 300 residences, a 75 room hotel, et cetera, and not increase -- and reduce traffic."

However, on appeal, Clean Energy argues the EIR did not discuss the energy impact *on the world* of tourists traveling to the Project area. To advance the exhaustion doctrine's purpose, " ' "[t]he 'exact issue' must have been presented to the administrative agency." ' " (*Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 527 (*Citizens*); see also Pub. Resources Code, § 21177, subd. (a); *Mount Shasta Bioregional*, *supra*, 210 Cal.App.4th at p. 215.) "This exhaustion requirement is jurisdictional." (*Mount Shasta Bioregional*, at p. 216.)

Clean Energy cites documents buried among the 81 appendices attached to its comment letter, such as (1) a World Tourism Organization document stating tourism accounts for 75 percent of all carbon dioxide emissions, and air travel makes up 40 percent of that total, (2) a National Ski Areas Association document suggesting use of travel agents to promote car-free vacations to mitigate impacts, and (3) a research paper identifying modeling procedures for assessing relative effects of destination planning strategies on energy use and greenhouse gas emissions. Nothing in Clean Energy's written or oral comments at the administrative level would have alerted the County of the need to address these buried documents. The County had no duty to pore over the 81 appendices submitted with Clean Energy's comment letter in order to figure out why Clean Energy submitted them. (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 484.)

Clean Energy argues that Public Resources Code section 21177, subdivision (a), does not mandate that the comment letter discuss the documents, and the regulations allow submission of data to support comments. (CEQA Guidelines, § 15204, subd. (c).) However, the submissions must relate to the comments, because CEQA requires that objections be sufficiently specific during the administrative process so that the agency has the opportunity to evaluate and respond to them. (*Tracy First*, *supra*, 177 Cal.App.4th at p. 926.) Nothing in the comments would have alerted the County to the worldwide tourism impact that Clean Energy belatedly raises.

We conclude Clean Energy failed to exhaust administrative remedies regarding worldwide tourism.

## E.  Climate Disruption Mitigation - Carbon Credits and Rail Packages

Clean Energy argues the evidence is insufficient to support the findings that (1) carbon offsets would be infeasible, and (2) rail packages would be infeasible. Homewood asserts Clean Energy failed to exhaust administrative remedies, yet again; we agree.

74

On these matters, Clean Energy's comment letter regarding the draft EIR reads: "<u>Climate Mitigation</u> [¶] The climate impacts of the project should be fully mitigated. *Mitigation can include carbon credits*, forest conservation projects, increased funding for transit service, increased funding for biking and pedestrian infrastructure, *marketing for rail packages*, subsidies for sustainable energy projects, increased development of on-site energy and storage resources, employee transit incentives, parking pricing, on-site public education, transit fare subsidies, new transit service, car-sharing programs, SOV reduction programs, support for electric vehicles, on-line ride matching, etc." (Italics added.) Nothing more was said.

As can be seen, carbon credits and rail packages are merely listed as two of sixteen potential mitigation measures, and no explanation as to either was provided. The final EIR included the County's response to Clean Energy's comments,[39] so Clean Energy knew the County's position when its representative appeared at the administrative appeal hearing. Yet the representative from Clean Energy gave no further explanation and made

---

[39] The County's response reads in pertinent part as follows: "The use of carbon credits and rail are not required by the DEIR[] because they are determined to be infeasible for the Project. Carbon offsets are a complicated and somewhat controversial source of mitigation. Offsets must be consistent with an approved and valid protocol to assure the emissions offsets would only occur due to the financing provided by purchasing of the credits (i.e., the carbon offset project would not be able to commence without the funding provided by the Proposed Project). Credits must also be purchased annually until the Project is decommissioned to offset long-term, operational emissions. The costs of carbon offsets depends on program development and may increase with time. Currently, offsets from reputable programs range between $10 to $30 per metric ton of CO2e. Purchasing offsets in perpetuity may therefore require the Project Applicant to pay hundreds of thousands of dollars over the Project lifetime. Given the controversial issues surrounding carbon offsets, as well as the economic burden, carbon credits would be infeasible for the Proposed Project. The Project area and character does not support rail, and construction of a rail system may cause secondary impacts to noise, biology, and other sensitive resources."

no comments concerning carbon credits or rail packages when he made his oral presentation at the administrative appeal hearing.

" ' '[U]nelaborated comment[s]" ' " will not suffice to exhaust administrative remedies. (*Citizens*, *supra*, 196 Cal.App.4th at p. 527.) An unelaborated comment is exactly what we have here. We conclude that Clean Energy failed to exhaust administrative remedies regarding its claim that the EIR does not contain substantial evidence supporting the determination that carbon credits and rail packages are not feasible mitigation measures for the Project.

## III.  Conclusion

We conclude the CEQA violation related to the County's failure to identify, describe, and analyze the wildfire evacuation risk compels reversal of the judgment. The County must take the action necessary on that issue to gain compliance with CEQA. (*LandValue 77, LLC v. Board of Trustees of California State University* (2011) 193 Cal.App.4th 675, 681-682; 2 Robie et al., Cal. Civil Practice: Environmental Litigation (2d ed. 2002 & 2015 supp.) § 8:33.)

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court with directions to enter a new judgment granting the petition for writ of mandate. The trial court shall issue a writ of mandate, ordering the County to set aside, void, and/or rescind: (1) its certification and adoption of the Project's EIR; (2) its inclusion of the Project in the West Shore Area General Plan; (3) its approval of the development agreement for the Project; (4) its approval of the Conditional Use Permit and Planned Development Permit; and (5) its approval of the Vesting Tentative Subdivision Map for the Homewood Mountain Report project. The trial court shall enjoin respondents and real parties in interest from approving the development project or carrying out any project activity that could adversely impact the physical environment, until the County takes the action necessary to identify, discuss and analyze the wildfire evacuation risk consistent with CEQA.

76

Clean Energy shall recover its costs on appeal.  (See Cal. Rules of Court, rule 8.278(a).)

      MURRAY      , Acting P. J.

We concur:


      DUARTE      , J.


      HOCH      , J.